770 A.2d 152

Robert W. BUXTON, et al.,

v.

Antoinette Bozievich BUXTON, et al.

No. 60, Sept. Term, 2000.

Court of Appeals of Maryland.

April 12, 2001.

636

Joseph P. Suntum and James L. Thompson (Miller, Miller & Canby, on brief), Rockville, for petitioners/cross-respondents.

Stephen E. Moss (Hadrian N. Hatfield and Amy B. Strent of Moss, Strickler & Sachitano, P.A., on brief), Bethesda, for respondents/cross-petitioners.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

Through his appointed guardian, Robert Buxton, a retarded adult, filed this lawsuit in the Circuit Court for Montgomery County against his father, Rex Buxton, and his step-mother, Antoinette Bozievich Buxton, accusing them, as fiduciaries, of the misuse, mismanagement, and misappropriation of his funds and property. Rex Buxton died during the pendency of the action. After a 10–day non-jury trial and the consideration of post-trial motions, the court entered an aggregate judgment of $617,342 against Rex's estate for the misuse, conversion, and misappropriation of various items of Robert's funds and property, a joint and several judgment of $312,710 against Rex's estate and Antoinette for failing to keep a house deeded to Robert by his parents profitably rented, and a judgment for $55,000 against Antoinette alone by reason of an encumbrance she placed on that house. The actual loss of rent from the house was determined to be $83,916, which, on post-trial motion, the court increased to $312,710 to take account of the earnings that it found could have been realized if the $83,916 in rent that should have been received from the property had been invested in stocks and bonds during the approximate 20–year period at issue.

Rex's estate acquiesced in the judgments against it, but Antoinette appealed those entered against her, raising issues of laches, sufficiency of evidence, and the boosting of the $83,916 to $312,710 by the addition of what Antoinette regarded as inappropriate pre-judgment interest. The Court of Special Appeals found no merit in the laches argument. It did, however, find some merit in her complaints regarding the manner in which Robert's losses arising from the non-rental of the house were calculated, and it disagreed entirely with the calculation of what it regarded as pre-judgment interest, and thus remanded the case to the Circuit Court for further proceedings. Neither Robert nor Antoinette were satisfied with the intermediate appellate court's disposition. We granted their cross-petitions to consider the issues of laches, the additional amount added to the $83,916 (whether characterized as pre-judgment interest or additional damages), and whether

the Circuit Court erred in admitting certain expert witness testimony regarding the calculation of lost rent.

## BACKGROUND

As a result of oxygen deprivation during the birthing process, Robert, who was 52 when this suit was filed, was left mentally retarded. From the time he was a child, his parents began making investments for him to assure his security after their death. In 1961, they purchased a house on Montauk Avenue in Bethesda, initially for his brother, Wayne, but which, in 1968, they deeded to Robert. A mortgage that was placed on the home was paid off in 1983. At first, the house was rented out, and the rent received was placed in a custodial account controlled by Rex. In 1970, through a Federal program for the handicapped, Robert's mother obtained a job for him in the mail room at the National Institutes of Health (NIH), where, at the time of trial, he continued to be employed and earned about $24,000/year. In 1973, upon his mother's efforts, Robert began living in a group home for retarded individuals.

The seeds of ensuing strife were sown in 1976–77, when Robert's parents went through a very bitter divorce. One consequence of that divorce was the departure of Robert's mother from the scene—she moved to Florida and then to the Deep Creek area, eventually became ill and disabled, and died in either 1995 or 1997, the record being somewhat inconsistent as to the date. Another was the removal of Robert from the group home. At some point, Rex developed a relationship with Antoinette, and, in September, 1976, he moved Robert into Antoinette's home in Potomac. In December, 1977, Rex and Antoinette were married, and he moved into the home as well. In the meanwhile, from 1976 to 1988, Rex permitted one Coy Thomas to live in the Montauk Avenue house. It does not appear that Mr. Thomas paid any rent during that 12–year period, although he said that he made between $8,000 and $10,000 in repairs and improvements to the house at his own expense. Antoinette confirmed that no rent was paid. At various times during his stay, at least three other people also

lived in the house rent-free—Jack Brookman, Sara Gerber, and Amy Collins. Some evidence was presented that Brookman assisted in making some repairs and that Amy Collins was allowed to live rent-free in settlement of a possible claim that she may have had against Robert by reason of having been raped on the property. The basis of any such claim was not explained and no specific finding was made regarding it.

In 1985, Rex, Antoinette, and Robert moved from Antoinette's home in Potomac to a larger property that she bought in Pleasant Hill. In conjunction with that move, Rex and Antoinette borrowed $79,000 in order to pay off some of Rex's bills and to improve space in the Pleasant Hill home that Rex used as an office. To secure that loan, Rex and Antoinette caused a mortgage to be placed on the Montauk Avenue house. At some point, according to Antoinette, she, Rex, and Robert decided to fix up the Montauk Avenue property and move there, in part because of Rex's deteriorating health. In 1988, she sold the Pleasant Hill home and, from the proceeds of the sale, paid off the mortgage on the Montauk Avenue home. After a brief stay in a rental property while extensive repairs and improvements were made to the Montauk Avenue home, they moved to the renovated house in 1990. According to Antoinette, she invested about $76,000 of her money to make those repairs and improvements. In May, 1991, she and Rex had Robert transfer by deed a half-interest in the Montauk Avenue house to her, and she placed another deed of trust, in the amount of $80,000 on the property. Robert received no consideration for the transfer. Antoinette testified that she took the 50% interest "as a protection to me that when the property was sold, the note would be paid." The deed of trust went into default and to the point of foreclosure four times during the next four years. At the time of trial, the loan balance was $77,600.

In 1991, concerned about Robert's perceived unhappiness, complaints by him that Rex or Antoinette were taking all of his money, and reports from one of his co-workers at NIH that he was scrounging in garbage cans for things to eat, Robert's sister, Priscilla, made a complaint to the Montgomery

County Department of Adult Protective Services.[1] When the agency spoke to Robert, he asked that the matter not be pursued, and Priscilla dropped it. In January, 1996, however, she and her brothers moved Robert out of the Montauk Avenue home, and, in September, with Robert's consent, she succeeded in having herself appointed guardian of his property. A month later, she filed this lawsuit on Robert's behalf. Rex and Antoinette responded with (1) a motion to dismiss based on laches and other defenses, and (2) a counterclaim against Robert for breach of contract and unjust enrichment. The essence of the counterclaim, which eventually was resolved in Robert's favor, was that Robert agreed to the conveyance of a half-interest in the property in exchange for Antoinette's investment and that, if she is required to relinquish her interest, Robert will be unjustly enriched.

Much of the evidence presented at trial dealt with bank accounts, pensions, and other assets of Robert that are no longer at issue. We are concerned only with the findings and remedies pertaining to the Montauk Avenue property. In that regard, the court announced from the bench its findings of fact that (1) there was a confidential relationship between Robert, on the one hand, and Rex and Antoinette, on the other, (2) as to financial matters other than minimal day-to-day expenditures, there was a total dependence by Robert and a reposing of trust by him, (3) there was dominion over virtually everything Robert did by Rex and there was dominion by Antoinette both personally and on financial matters, (4) there was "absolutely no need" for Antoinette to obtain an ownership interest in the house, (5) Robert had little or no ability to appreciate the significance of or supposed need for transferring a half-interest in the property to her, (6) Coy Thomas's occupancy of the house for 12 years was not for Robert's benefit but rather entirely for the benefit of Rex and Antoinette—that it was, in effect, recompense for services he rendered to them, (7) the repairs and improvements that

---

1. It is not clear whether her complaint was a formal one in writing. Priscilla testified that she may have called in the complaint.

Thomas allegedly made did not materially improve the property, (8) Robert received no benefit from the occupancy by Brookman, Gerber, and Collins, (9) rent should have been set aside for Robert during the period 1989–1995, (10) the rental value of the property during that period, *i.e.,* the rent lost to Robert, was $83,916, (11) of the amounts invested by Antoinette in 1989–90, only $35,000 inured to Robert's benefit, the rest of the work being for the benefit of Rex or Antoinette, and (12) Robert's execution of the 1991 mortgage arose from a breach of the confidential relationship—that he did not understand the ramification of the mortgage and did not truly assent to it. It was upon those findings that the court announced its intention to enter a joint and several judgment against Rex's estate and Antoinette for $83,916 and a separate judgment against Antoinette for $55,000.

Following the announcement of those conclusions, Robert moved for a clarification of the award. Although that motion is not in the record extract, it appears that Robert sought an increase in the damages awarded for lost rentals from the Montauk Avenue property in accordance with the calculations made by one of his witnesses, Thomas Borzilleri. Dr. Borzilleri, through testimony and an exhibit, calculated the net loss in rental for each year from 1976 through 1995—the aggregate being $83,916, determined the investment returns that could have been earned on those annual amounts based on the Standard and Poor 500 index and the yields from corporate bonds, long-term Government bonds, and 5–year Government bonds, and, assuming a mix of 40% stock investment and 60% bond investment, opined that, had the property been rented at the amounts determined and had the rentals then been invested in that 40/60% mix, the aggregate pre-tax return to Robert would be $312,170.

The court apparently found that evidence persuasive, for, on January 21, 1999, it entered a written judgment that incorporated a judgment for $312,710 jointly and severally against Rex and Antoinette. As noted, another part of that judgment was one for $55,000 against Antoinette alone "for her liability in connection with encumbering [Robert's] property with the

Deed of Trust ... in the original amount of $80,000 which still exists as an encumbrance against the property." Upon the denial of her motion to alter or amend the judgment, Antoinette noted an appeal.

The Court of Special Appeals found several problems with the trial court's analysis, calculations, and judgments. It first noted two obvious facial errors—the unexplained conversion of the $312,*170* sought in the motion for clarification to $312,*710* in the judgment, and the arithmetic error of $10,000 arising from the findings relating to the deed of trust and repairs. The 1991 deed of trust was for $80,000. The court found that only $35,000 of the repairs made by Antoinette benefitted Robert and intended to give her credit only for that amount. Under the Circuit Court's own determination, therefore, the net amount owed by Antoinette by reason of the deed of trust should have been a maximum of $45,000 ($80,000 less $35,000, without consideration of the reduction of the deed of trust obligation to $77,600), but, without any further explanation, the court entered the judgment for $55,000. Exercising its authority under Maryland Rule 8–604(c), the appellate court modified the two judgments to $312,170 and $45,000, respectively.

Based on the Circuit Court's express findings that Robert was a disabled person and that no prejudice was suffered by Rex or Antoinette by the delay in filing this lawsuit, the Court of Special Appeals rejected Antoinette's claim of laches, holding that Robert's mental incapacity served to toll a claim of laches. With respect to the judgment itself, however, the appellate court found a number of problems, mostly emanating from the lack of specific factual findings. It was not clear when Antoinette first became responsible for renting out the Montauk Avenue property; no finding was made with respect to the contention that Amy Collins was allowed to live in the property rent-free in settlement of a possible claim she might have had against Robert; no finding was made whether Robert was denied any use of his property while he was living in it; no finding was made whether (or why) Antoinette was responsible for paying rent to Robert during the period 1990–

1995, when she, Rex, and Robert were occupying the property together; and no explanation was given for how the court calculated the $35,000 credit allowed to Antoinette for the repairs she made. Finally, the appellate court struck entirely what it regarded as the pre-judgment interest added in response to the motion for clarification. It held that there was no duty on the part of Antoinette to invest lost rentals in a mix of stocks and bonds and that any pre-judgment interest must be limited to the 6% permitted under Art. III, § 57 of the Maryland Constitution.

Robert complains about the holding that wiped out the increase from $83,916 to $312,170, asserting that the Court of Special Appeals erred in regarding that increase as pre-judgment interest. Antoinette presses her claim that the entire action was barred by laches, defends, in part, the treatment of the increase as pre-judgment interest, but asserts that *no* pre-judgment interest is permissible under the circumstances of this case, and attacks the method by which Dr. Borzilleri calculated the $83,916 in lost rentals. No complaint is made about any of the other rulings or adjustments made by the intermediate appellate court.

## DISCUSSION

### Laches

Citing *Staley v. Staley,* 251 Md. 701, 703, 248 A.2d 655, 657 (1968), the Court of Special Appeals noted that laches is an equitable defense that bars a plaintiff's action if the plaintiff was negligent or lacked diligence in asserting his rights, causing prejudice or injury to the defendant. It observed as well that whether laches applies in any given case depends on the facts and circumstances of the case. Responding to Antoinette's argument that Priscilla's complaint to the county agency in 1991 demonstrated that the claims made in this action could have been made much earlier, the appellate court concluded that, because Priscilla was not then Robert's guardian but a mere volunteer she had no duty to pursue the complaint on his behalf at the time. It stated that its "holding

that mental incapacity tolls a claim of laches until a court appoints a guardian" was consistent with Maryland Code (1998), Cts. & Jud. Proc. art., § 5–201, which tolls the statute of limitations for minors or individuals who are mentally incompetent. In that regard, it noted that, in determining whether to apply the doctrine of laches, the statute of limitations applicable to actions at law "may be used as a guideline" and that the court had previously held that, for purposes of the statute of limitations, a mentally incompetent person's claim does not begin to accrue until a guardian capable of having the knowledge or awareness of the alleged wrong is appointed by a court.

Antoinette regards that analysis as a "new bright-line rule that erases all distinction between the doctrine of laches and the statute of limitations in actions brought on behalf of an incompetent person" and that makes the individual facts of the case "irrelevant to analysis of a laches defense asserted against an incompetent." She urges that this "new analysis begins and ends with finding that the plaintiff is incompetent and that suit was filed within the statute of limitations, commencing when the guardian was appointed" and that it never considers whether the incompetent person had sufficient knowledge or awareness to have brought the action earlier, whether the particular delay was undue, or whether there was prejudice to the defendant.

 We set forth the basic principles regarding laches in *Parker v. Board of Elec. Sup.*, 230 Md. 126, 130–31, 186 A.2d 195, 197 (1962). Those principles still apply. Laches is a defense in equity against stale claims; the word, itself, derives from the old French word for laxness or negligence. We observed in *Parker* that "[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Id.* The passage of time, alone, does not constitute laches but is simply "one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made." *Id.* In that

regard, there *is* a relationship between laches and the statute of limitations, although the statute does not govern. We held that, "[i]n a purely equitable action, a lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine; and, where the delay is of less duration than the statute of limitations, the defense of laches must include an unjustifiable delay and some prejudice to the defendant." *Id.* "What amounts to 'prejudice,' such as will bar the right to assert a claim after the passage of time, depends upon the facts and circumstances of each case, but it is generally held to be anything that places him in a less favorable position." *Id.* Finally, and of particular relevance here, we stated in *Parker* that "since laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or the means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches." *Id.* at 131, 186 A.2d at 197.

One area in which the courts have found a close affinity between the law dealing with limitations and that dealing with laches is where the plaintiff is or has been under a legal or mental disability. It has long been the case, as part of the statute of limitations itself, that the statute is tolled during the period that the plaintiff was an infant or mentally incompetent. *See Funk v. Wingert,* 134 Md. 523, 107 A. 345 (1919).[2] The current statute, embodied in Maryland Code, § 5–201 of the Courts and Judicial Proceedings Article, tolls the running of limitations in favor of a "minor or mental incompetent" until "the disability is removed." In *Funk v. Wingert, supra,* we

---

**2.** In *Funk,* we held that even the appointment of a committee for an incompetent did not trigger the running of the statute of limitations, because the committee did not hold legal title to the incompetent's property and could not sue in the committee's own right but only in the name of the incompetent person. *Id.* at 526, 107 A. at 346. Under current law, a guardian for the property of an incompetent person *does* hold title to the protected person's property. *See* Maryland Code (1991), Est. & Trusts art., § 13–206. Whether the appointment of such a guardian commences the running of the statute, or of laches, is a matter we need not decide in this case, as no complaint has been made of any undue delay between the appointment of Priscilla as guardian and her filing of this lawsuit.

made clear that the disability at issue is not simply the lack of an ability to sue, but rather "the general disability of lunacy or infancy as to the care of property and the safe-guarding of rights." 134 Md. at 527, 107 A. at 346. In *Doe v. Maskell*, 342 Md. 684, 698, 679 A.2d 1087, 1093–94 (1996) (quoting with approval from *Decker v. Fink*, 47 Md.App. 202, 207, 422 A.2d 389, 392 (1980)), we stated that the reach of § 5–201 was limited to plaintiffs "who are insane and 'unable to manage [their] business affairs or estate, or to comprehend [their] legal rights or liabilities.' "

It is generally well established that the kind of mental disability that will toll the statute of limitations will also prevent the operation of laches. *See Fid. & Dep. Co. v. State*, 164 Md. 304, 314–16, 165 A. 176, 180–81 (1933); *Green v. Lombard*, 28 Md.App. 1, 14, 343 A.2d 905, 914 (1975); RE-STATEMENT (SECOND) OF TRUSTS § 219 cmt. d (1959) (Beneficiary of trust will not be barred by laches as long as he is under an incapacity); 3 AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 219.3 (4th ed.1988) ("Where a beneficiary of a trust is under a legal incapacity, such as infancy or insanity, he is not barred by laches from holding the trustee liable for breach of trust as long as the incapacity continues. In this respect the rule as to laches is the same as the rule under statutes of limitations").

■ What is not clear is whether, for purposes of either the statute of limitations or laches, the notion of "insanity," which is not a medical term but an imprecise legal one, can include a significant mental retardation or, if not, whether such retardation can nonetheless constitute an equivalent type of disability as insanity (or, using more archaic terms, lunacy or *non compos mentis* ). There is some authority for the proposition that the term "insanity," as used in statutes of limitations, does not have a technical meaning and includes a broader range of mental incompetence. *See Hurd v. County of Allegany*, 39 A.D.2d 499, 336 N.Y.S.2d 952, 956–57 (1972), cited in *Decker v. Fink, supra*, 47 Md.App. at 207, 422 A.2d at 392. The more important question is whether it is the particular

form of mental incompetence that is significant or whether it is the inability of the person, by reason of the incompetence, to understand that he or she has a cause of action and to take the necessary steps to file the action. If, as we believe is the case, it is the actual disability, rather than the particular nature of the mental dysfunction, that is critical, we see no reason why retardation, if severe enough to have that effect, cannot also serve as a basis for precluding the operation of laches. At least with regard to a mentally incompetent person, this principle is simply a corollary to the affirmative requirement that, for laches to operate, the plaintiff must have had knowledge, or the means of knowledge, of the facts that create his cause of action. If the person is sufficiently incompetent mentally, whether by derangement or retardation, he or she is not likely to have that knowledge, or means of knowledge.

In this regard, the law does not require that the person be in a mentally vacuous or vegetative state; it suffices if the person is unable, by reason of mental incompetence, to manage his or her own business affairs or comprehend his or her legal rights and liabilities. The Circuit Court made such a finding in this case, and there was sufficient evidence to support that finding. It would, of course, have been helpful if the findings made by the court in the guardianship proceeding had been placed in evidence, but we may properly assume, in the absence of evidence to the contrary, that, in appointing Priscilla as the guardian of Robert's property, that court properly concluded, in accordance with Maryland Code (1991), Est. & Trusts art., § 13–201, that Robert was "unable to manage his property and affairs effectively" because of mental disability.[3] Apart from that inference, there was direct evi-

---

3. Section 13–201 also permits a guardianship of the property upon a showing that the person is unable to manage his or her property because of physical disability, disease, habitual drunkenness, addiction to drugs, imprisonment, compulsory hospitalization, confinement, detention by a foreign power, or disappearance. None of those kinds of disability were ever asserted with respect to Robert. The only fair inference was that the guardianship rested on a finding of inability to

dence of Robert's historic and continuing inability to appreciate the consequences of executing the deed and deed of trust or to deal with financial matters beyond minimal daily expenditures. Priscilla's complaint to the county agency in 1991 does not, of itself, trigger the application of laches. *See Culbertson v. Secretary of Health & Human Services,* 859 F.2d 319 (4th Cir.1988). She was acting as a volunteer and had no continuing duty to Robert to pursue the matter, and there was no evidence that, as a result of Priscilla's action at that time, Robert became any more aware of his legal rights and liabilities than otherwise was the case. We find no error in the court's rejection of Antoinette's laches defense.

### *Calculation Of Lost Rentals*

■ The calculation of lost rentals came from the testimony of two experts—E.L. Dieudonne, Jr., a real estate appraiser, and Thomas Borzilleri, an economist and economic consultant. Dieudonne gave two opinions. One was of the fair *market* value of the Montauk Avenue property as of June 30, 1989 and June 30, 1990; that opinion related to the value of the renovations made to the home by Antoinette. The other opinion was of the fair *rental* value of the home from 1976 to 1996. In that determination, Dieudonne relied on what he regarded as a comparable rental of $350/month in 1976, a comparable rental of $1,200/month in 1996–97, a stated rate in 1978 of $450/month, a figure of $650/month that Antoinette used in her application for the 1985 mortgage loan, rents charged for what he regarded as comparable homes at various times between 1976 and 1996, and the percentage increase in assessed value of the property between 1976 and 1995, which averaged, on a straight-line basis, 9%/year. Though recognizing that actual rentals would rise at different rates and remain at different levels over time, he opined that the "most acceptable and most indicative method" of determining annual rental values over the 20–year period was to assume a constant,

---

manage his property or understand his legal rights due to his retardation, or mental disability.

straight-line percentage increase from the $350 in 1976 to the $1,200 in 1996. He determined that constant percentage increase to be 6%/year, which he regarded as conservative.

Dr. Borzilleri accepted Mr. Dieudonne's conclusion. From the gross annual rental values thus determined, he deducted payments on the mortgage that was on the property from 1976 through 1983, property taxes, an 8% management fee, and 15% for maintenance and repairs, and listed the net rental value for each year. The aggregate of those net amounts, for the 20–year period, was $83,916. As noted, he then calculated the return that would have been received by Robert on each of the net annual amounts had they been promptly invested, 40% in stocks and 60% in bonds. That is what led to the figure of $312,170.

In this part of the opinion, we are concerned with the $83,916. Though cradled in an extensive discussion of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), none of which are particularly relevant here, Antoinette's complaint is essentially that the calculations by Mr. Dieudonne and Dr. Borzilleri are unsupported, unreliable, and inaccurate. She asserts that the beginning and ending figures of $350 and $1,200 were rents charged for other properties and that the straight-line approach used by the experts did not comport with economic reality.

■ The standard for admissibility of expert testimony in Maryland is set forth in Maryland Rule 5–702. Expert testimony is admissible if the court determines that the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. In making that determination, the court must determine "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." In *In re Adop-*

*tion/Guardianship No. CCJ14746,* 360 Md. 634, 647, 759 A.2d 755, 762 (2000), we confirmed that "[i]t is within the sound discretion of the trial judge to determine the admissibility of expert testimony" and that "[t]he trial court's action in the area of admission of expert testimony seldom provides a basis for reversal."

We find no such basis in this case. Both experts demonstrated their ample qualifications, by training and experience, to render the opinions as to annual rental value; both described the basis for their assumptions and calculations and agreed that a straight-line approach was an acceptable method of determining annual rental values over such a long period. That kind of opinion testimony could, indeed, be helpful to the trier of fact in determining damages. Through cross-examination, Antoinette was able to bring before the court challenges to some of the assumptions—that rentals remained relatively flat for a period of time and then rose sharply—but the court was free, within its discretion, to accept the straight-line approach as an appropriate method of approximating a return that could not be precisely calculated because the house was not, in fact, rented. As we said in *Maryland Nat'l Bank v. Cummins,* 322 Md. 570, 591, 588 A.2d 1205, 1215 (1991), "[a]n equity court may afford a remedy by approximation, particularly where the defendant's conduct makes precision impossible." [4]

### *Duty To Invest/Pre-Judgment Interest*

The principal issue raised in the cross-petitions is whether (1) the amount added to the $83,916 constituted permissible damages arising from an independent duty on Antoinette's part to prudently invest the rentals she should have received from the property, or was the amount in the nature of pre-judgment interest, and (2) if the latter, whether pre-judgment

---

4. Our holding that the evidence presented by these two witnesses was admissible is not intended to denigrate the concerns expressed by the Court of Special Appeals relating to the need for further findings regarding Antoinette's liability.

interest is allowable in this circumstance. Those are two different issues, but they may be considered together.

The Court of Special Appeals treated the difference between the estimated rental loss of $83,916 and the judgment for $312,170 as pre-judgment interest and held that, at best, such interest was limited to 6%. Robert complains that the appellate court misunderstood the basis of the increase—that it was not pre-judgment interest but rather constituted an additional loss to him arising from Antoinette's failure to prudently invest the amounts she should have received in rent. Relying largely on *Maryland Nat'l Bank v. Cummins, supra,* 322 Md. 570, 588 A.2d 1205, he urges that, as a fiduciary, Antoinette had a legal duty to invest the funds prudently, that the Circuit Court properly accepted Dr. Borzilleri's opinion that a 40/60% investment in stocks and bonds was a prudent investment, and that Robert is entitled to the additional income that such an investment would have produced. In holding otherwise, he avers, the Court of Special Appeals misread and effectively ignored our holding in *Cummins.* Antoinette defends the appellate court's conclusion that she had no duty to invest those rentals, especially as she never received them, in stocks and bonds.

■ Robert is right on one point, but wrong on another. The amounts calculated by Dr. Borzilleri and added by the Circuit Court were *not* in the nature of pre-judgment interest. Pre-judgment interest, we held in *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 24, 344 A.2d 65, 79 (1975), is "to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." It compensates the judgment creditor for *his or her* inability to use the funds that should have been in his or her hands at some earlier time and usually does not depend on what the debtor might have done with the money. The amounts added pursuant to Dr. Borzilleri's calculations, however, were not of that nature but proceeded from an assumed independent obligation on the part of Antoinette to invest Robert's funds. Those amounts were not added to

compensate Robert for *his* inability to use the rent that should have been collected—that would have been limited to a 6% rate without regard to whether Robert would, or would not, have invested those funds—but were based on what Antoinette should have done with the rents. That is clear from *Cummins.*

*Cummins* involved a class action by income beneficiaries of express trusts who were entitled to monthly or quarterly distributions of income earned from the trusts. The beneficiaries challenged the practice by the corporate trustee of leaving amounts of income less than $1,000, received as interest or dividends from investments, in a non-interest bearing account until the next periodic distribution. The Circuit Court found that it was feasible for the bank to have invested those funds rather than allow them to remain unproductive and, as damages for the breach of its duty to secure a reasonable return on the trust property, surcharged the trustee an amount that reasonably could have been earned had the idle funds been so invested, plus pre-judgment interest on that amount. We affirmed the surcharge for lost investment income but modified the allowance of pre-judgment interest on that amount, holding that the plaintiffs were entitled to no more than simple interest at the rate of 6%.

The linchpin of our holding regarding the lost investment income was the duty of a trustee to manifest "the care, skill, prudence, and diligence of an ordinarily prudent [person] engaged in similar business affairs and with the objectives similar to those of the trust in question." *Cummins, supra,* 322 Md. at 580, 588 A.2d at 1209–10 (quoting from G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 541 (2d ed.1960)). That duty, we confirmed, encompassed an obligation "to secure a 'just' or 'reasonable' return while avoiding undue risk." *Id.* (quoting from *Board of Trustees v. City of Baltimore,* 317 Md. 72, 103, 562 A.2d 720, 735 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990)). The cases we cited for our holding on that point all involved fiduciaries such as trustees or personal representatives, who are authorized and

have a legal duty to keep the estate funds profitably and prudently invested.[5]

■ The problem with Robert's position is that it fails to distinguish between the duties and obligations of true fiduciaries and those arising solely from a confidential relationship that may exist between any two or more people. Professor Scott articulates the distinction quite well. A fiduciary relationship, he observes, such as between trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, corporate directors and their corporation, "involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." 1 SCOTT & FRATCHER, THE LAW OF TRUSTS, *supra*, § 2.5. That is not necessarily the case with respect to persons in a confidential relationship. Scott and Fratcher note:

"A fiduciary relation is to be distinguished from a merely confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or such a relation of confidence as that which arises between physician and patient or priest

---

5. *See Attorney Grievance Comm'n v. Owrutsky*, 322 Md. 334, 587 A.2d 511 (1991) (handling of client funds as attorney in fact and misconduct during service as personal representative and trustee); *Board of Trustees v. City of Baltimore, supra*, 317 Md. 72, 562 A.2d 720 (trustees of municipal pension plan); *Shipley v. Crouse*, 279 Md. 613, 370 A.2d 97 (1977) (trustee of express trust); *Estate of Orrantia*, 36 Ariz. 311, 285 P. 266 (1930) (bank acting as executor); *New England Trust Co. v. Triggs*, 334 Mass. 324, 135 N.E.2d 541 (1956); *Cheyenne–Arapaho Tribes of Okl. v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975) (U.S. Government acting as trustee of funds belonging to Indian tribes); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238 (N.D.Cal.1973) (same); *In re Doyle's Will*, 191 Misc. 860, 79 N.Y.S.2d 695 (1948) (testamentary trustees); *In re Haigh's Estate*, 133 Misc. 240, 232 N.Y.S. 322 (1928) (corporate executor). *See also Carey v. Safe Dep. & Tr. Co.*, 168 Md. 501, 178 A. 242 (1935) (trustee of express trust); *Goldman v. Rubin*, 292 Md. 693, 441 A.2d 713 (1982) (personal representative).

and penitent.... A fiduciary relation involves certain consequences as to transactions between the parties that flow automatically as a matter of law from the relation.... On the other hand, where there is merely a confidential relation between the parties, such consequences do not automatically follow."

*Id.*

Although the Circuit Court at times used the terms "confidential" and "fiduciary" interchangeably, it seems clear, from both the evidence and the bulk of the court's findings, that the relationship in question was not a fiduciary one, but only a confidential one that arose from Robert's limitations, his dependence on Rex and Antoinette, and their position of dominance over him. There was no evidence of any express trust, nor was there a finding of a constructive or resulting trust. Antoinette was never appointed as Robert's guardian. There was no evidence that she was ever authorized by Robert, by a court, or by some valid instrument to invest Robert's funds in stocks and bonds. That task was, at one time, undertaken by Robert's parents, but, although Antoinette may have assisted Rex in taking charge of Robert's earnings, there is no indication that she ever assumed a duty to invest his funds as a trustee would do or that Robert expected her to invest his funds in stocks and bonds.

There may well be situations in which the scope of a confidential relationship could include a duty to invest, if that is the basis, or part of the basis, of the relationship, but such a duty does not inhere in a confidential relationship, as it more likely would do in a fiduciary one. To impose such a duty, particularly in a family situation, which often involves elderly, infirm, or incompetent persons being cared for by family members or friends, would be to create an obligation beyond that anticipated by the caregiver and that, as a practical matter, cannot be properly fulfilled in many cases. If, as a result of the confidential relationship, the one in whom trust is reposed acts improperly, the transaction can be undone and the dominant person can be made to restore the property

taken or make good the loss, but to superimpose on the duty to act in good faith a further, independent duty to prudently invest the reliant one's funds, as a matter of law, is unwarranted. For *that* reason, not because this was in the nature of pre-judgment interest, the Court of Special Appeals was correct in reversing that aspect of the judgment.

 We turn, finally, to the issue of pre-judgment interest, and it is here also that we part company with the Court of Special Appeals. There are three basic rules governing the allowance of pre-judgment interest. Pre-judgment interest is allowable as a matter of right when "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date." *First Virginia Bank v. Settles,* 322 Md. 555, 564, 588 A.2d 803, 807 (1991); *State Highway Admin. v. Kim,* 353 Md. 313, 326, 726 A.2d 238, 245 (1999); *United Cable v. Burch,* 354 Md. 658, 668, 732 A.2d 887, 892 (1999). As we explained in *I.W. Berman Prop. v. Porter Bros., supra,* 276 Md. at 16–17, 344 A.2d at 75, the right to pre-judgment interest as of course arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent. Pre-judgment interest has been held a matter of right as well in conversion cases where the value of the chattel converted is readily ascertainable. *See Robert C. Herd & Company v. Krawill Machinery Corp.,* 256 F.2d 946 (4th Cir.1958), *aff'd,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959).

 On the other hand, in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed. In *Taylor v. Wahby,* 271 Md. 101, 113, 314 A.2d 100, 106 (1974), we held that, in a

tort action in which the claim is unliquidated and not reasonably ascertainable until the verdict, interest runs from the time of verdict. Between these poles of allowance as of right and absolute non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact. *See Crystal v. West & Callahan,* 328 Md. 318, 343, 614 A.2d 560, 573 (1992); *I.W. Berman Prop. v. Porter Bros., supra,* 276 Md. 1, 344 A.2d 65.

In a footnote in its opinion, the Court of Special Appeals concluded that, in this case, an award of pre-judgment interest, at the rate of 6% per annum, was discretionary, thus allowing the Circuit Court, on remand, to make such an award if it chose to do so. We disagree. For one thing, this is not a breach of contract case. Robert sued for breach of fiduciary duty, an accounting, annulment of the 1991 deed making Antoinette a half owner of the Montauk Avenue property, declaratory judgment determining the validity of that deed, for a constructive trust and subsequently for conversion. The court annulled the deed, but granted all other relief under the claim for accounting. More important, the damages awarded for the loss of rent from the Montauk Avenue property were not only unliquidated but wholly incapable of reasonable ascertainment prior to verdict. The $83,916 was based entirely on statistical assumptions developed by expert witnesses employed for the purpose of the litigation, rather than on any hard evidence of actual rental value.

This is not a case where rent was actually received but withheld or even where specific rent was due under a lease but not collected. The award took into account not only the 12 years when strangers were living in the property, one or more of whom made some improvements, but also the one or two years when no one was in the property because it was being substantially renovated and the six years that Robert, Rex, and Antoinette lived there together. The issue of substantive liability was determined, and will need to be redetermined, largely on the basis of credibility of the witnesses, rather than on the interpretation of any documents from

which a predictable result could flow. In summary, the precise damages in this case were so unpredictable and incapable of estimation prior to verdict that it would, indeed, be an abuse of discretion to award any pre-judgment interest.

### Conclusion

For the reasons noted, we shall vacate the judgment of the Court of Special Appeals and direct that it remand the case for further proceedings in the Circuit Court consistent with the opinion of that court, as modified by the opinion of this Court. As noted, we have not disturbed those aspects of the Court of Special Appeals opinion calling for further fact-finding and clarification by the Circuit Court with respect to the calculation of the $83,916 or the $35,000 credit on the deed of trust, and those matters will have to be addressed by the Circuit Court as directed by the Court of Special Appeals. Nor have we modified the intermediate appellate court's determination that the increase to $312,170 was inappropriate, although we have affirmed that determination on a different ground. The only modification we have made is our holding that no pre-judgment interest may be awarded on remand.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH OPINION OF COURT OF SPECIAL APPEALS AS MODIFIED BY THIS OPINION. COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.