28 A.3d 11

**BALTIMORE COUNTY, MARYLAND**

v.

**AECOM SERVICES, INC., f/k/a DMJM H & N, Inc.**

**No. 1301, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 1, 2011.

---

386

James J. Nolan & Jennifer Frankovich (Michael E. Field, County Attorney, on the brief), Baltimore, MD, for appellant.

James F. Lee, Jr. (Arthur T.K. Norris, Lee & McShane, PC, on the brief), Washington, D.C., for appellee.

Panel: MEREDITH, HOTTEN and WATTS, JJ.

WATTS, J.

This appeal concerns a dispute between Baltimore County (the "County") and DMJM H & N, Inc., now known as AECOM Services, Inc. ("DMJM"),[1] regarding payment for services performed in connection with the expansion of the Baltimore County Detention Center. The County and DMJM entered into a contract in which DMJM was appointed as the "[a]rchitect to provide professional architectural/engineering services in connection with a project to construct an addition and associated parking structure at the Baltimore County Detention Center" (the "Project").[2] The County filed suit against DMJM in the Circuit Court for Baltimore County alleging breach of contract and negligence, and DMJM filed a Counterclaim and an Amended Counterclaim seeking payment for services under the "base contract" and for "additional services." A jury awarded damages in favor of DMJM, including payment for the additional services. The County noted this timely appeal and raised two issues, which we quote:

 I. Whether the Circuit Court erroneously denied Baltimore County's Motion for Judgment at the conclusion of the trial with respect to DMJM's claim for additional

---

1. DMJM was formerly known as Daniel, Mann, Johnson & Mendenhall. Prior to trial in this action, DMJM merged with a corporation known as AECOM Services, Inc. For consistency with the contract and trial court pleadings, we will refer to appellee as DMJM.

2. The construction project at the Baltimore County Detention Center involved construction of an addition and associated parking structure to the Detention Center. The addition was to include a housing unit to accommodate 784 beds and several core or support areas. The core or support areas were to include: (1) a public lobby; (2) a facility administration space; (3) an intake and release space; (4) an educational space; (5) a laundry space; (6) a commissary; (7) a medical area; (8) a food services space; (9) a maintenance space; and (10) an indoor and outdoor recreation area. The associated parking structure was to be a parking garage with a 300 vehicle capacity. DMJM was to provide professional architectural/engineering services in connection with the construction project.

services, because there was no contract amendment approved by the County Council for those services?

II. Whether DMJM's counterclaim for additional services was barred by the one-year statute of limitations in Md. Ann.Code, Article 25A, § 1A(c)? [3]

DMJM filed a cross-appeal and raised one issue, which we quote:

I. Did the trial court err in refusing to submit to the jury the issue of pre-judgment interest on [DMJM]'s counterclaim for unpaid fees; and did the trial court improperly usurp the role of the jury by making its own fact-based ruling denying [DMJM] any pre-judgment interest, whether on the base contract award or additional services?

We answer the County's first question in the affirmative, and answer DMJM's question in the negative. As such, we shall reverse, in part, and affirm, in part, the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 18, 2000, the parties entered into the Department of Public Works Agreement for Architectural Services (the "contract") which appointed DMJM as the architect to provide professional architectural/engineering services in connection with the Project. Under the contract, DMJM was to be paid $4,516,779.16. As to changes in the work or services to be performed and payment, the contract provided, in pertinent part, as follows:

*ARTICLE 4—CHANGES*

4.1 The County may, at any time, by written order, make changes within the general scope of this agreement in the services or work to be performed. If such changes cause

---

3. The County contends that DMJM's counterclaim for additional services is barred by the one-year statute of limitations in Md. Ann.Code, Article 25A, § 1A(c). In light of our conclusion that the trial court erred in denying the County's Motion for Judgment with respect to DMJM's claim for additional services, we need not address this argument.

an increase or decrease in the Architect's cost of, or time required for, performance of any services under this Agreement, whether or not changed by any order, an equitable adjustment shall be made and this Agreement shall be modified in writing accordingly. Any claim of the Architect for adjustment under this clause must [be] asserted in writing within thirty (30) days from the date of receipt by the Architect of the notification of changes unless the County grants a further period of time before the date of final payment under this agreement.

4.2 No services for which an additional compensation will be charged by the Architect shall be furnished without the written authorization of the County.

\* \* \*

*ARTICLE 7—PAYMENT (COST PLUS PROFIT)*

\* \* \*

7.2 Direct Labor Costs, as used herein, shall be actual salaries paid to productive employees before tax and other deductions and does not include overhead expenses, administrative support time, payroll taxes, workmen's compensation and/or other insurances summary of the total Professional Fee and Other Direct Costs. This amount shall not exceed a total value of *Four Million Five Hundred Sixteen Thousand, Seven Hundred Seventy-Nine and 16/100 Dollars ($4,516,779.16)* unless authorized by properly executed amendment.

There shall be no interchangeability between the Upset Limit for Professional Fee and the Upset Limit for Other Direct Costs unless there is an approved amendment to the agreement. Such amendment may be approved by the County Administration if there is no increase in the total contract price under this section.

\* \* \*

7.11 Final payment to the Architect shall be made upon completion and acceptance of the professional services specified under the terms of this agreement.

\* \* \*

*ARTICLE 21—SPECIAL CAUSES*

21.1 Council Approval: The Architect covenants that this Agreement is subject to and in compliance with provisions of Section 715 of the Baltimore County Charter, Article VII, title, "Budgetary and Fiscal Procedures."

On September 19, 2005, the parties entered into an "Amendment to [the] Contract" increasing the contract payment from the original contract price of $4,516,779.16 to $4,785,752.36. The amendment was signed by the President of DMJM, the Administrative Officer of the County and the Baltimore County Council Chairman. The Amendment was approved for legal form and sufficiency by an Assistant County Attorney, and was reviewed and approved by the Director of the Office of Budget and Finance for the County.

On January 20, 2006, the County filed a two-count complaint against DMJM in the Circuit Court for Baltimore County alleging that DMJM breached the contract and negligently performed architectural/engineering services resulting in damages to the County in the amount of five million dollars. DMJM filed an Answer and Counterclaim. In the Counterclaim, DMJM alleged breach of contract and sought an award of $800,000 in unpaid fees and interest under the contract.

On April 16, 2008, the County filed an amended complaint, and DMJM filed an answer. The County propounded interrogatories including interrogatory number five which directed: "Itemize and show how you calculate any contractual damages claimed by your Counterclaim, and describe any non-economic damages claimed by you." On August 18, 2008, DMJM filed supplemental answers to interrogatories, including a supplemental answer to interrogatory number five, stating:

DMJM's claim for unpaid Architectural and Engineering base services is based on time expended. The time records and invoices have, or will be, produced to Baltimore County and are incorporated by reference. The amount owed for base contract services is $782,577.78. **A summary of additional services claimed is attached to these Supplemen-**

tal Answers and totals $1,633,060.30 for a total counter-claim of $2,415,638.08.

(Emphasis added). Attached to the supplemental answers to interrogatories, DMJM provided a spreadsheet which contained five categories, A, B, C, D, and E, titled as follows:

A. Original A/E Services Agreement and Agreement Modification(s)

B. Submitted, Negotiated, But No Contract Modification Executed

C. Submitted, Not Negotiated or Authorized

D. Submitted, Informally Authorized, No Contract Modification Executed

E. Pending, Not Submitted.

Under category A, "[o]riginal A/E Services Agreement and Agreement Modification(s)," DMJM listed the contract amount as amended on September 19, 2005, $4,785,752.36. Under the remaining categories, DMJM listed the following amounts as "Proposal Amounts":

B. Submitted, Negotiated, But No Contract Modification Executed: $667,047.11

C. Submitted, Not Negotiated or Authorized: $84,578.87

D. Submitted, Informally Authorized, No Contract Modification Executed: $18,586.34

E. Pending, Not Submitted: $999,453.06.

This spreadsheet was admitted at trial as the County's Exhibit 173B.

On January 7, 2009, the County filed a second amended complaint, and on May 1, 2009, the County filed a third amended complaint, setting forth six counts: (1) Breach of Contract; (2) Negligence; (3) Negligence–Special Representation; (4) Intentional Misrepresentation; (5) Negligent Misrepresentation; and (6) Concealment/Deceit. DMJM filed a Motion for Partial Summary Judgment. Following a hearing, the trial court granted DMJM's Motion for Partial Summary Judgment as to counts three, four, five, and six of the County's

Third Amended Complaint. As a result, only count one (Breach of Contract) and count two (Negligence) of the Third Amended Complaint remained for trial.

On February 20, 2009, in a document titled "Second Supplemental Answers to Interrogatories," DMJM claimed damages totaling $2,173,714.37. Attached to the Second Supplemental Answers to Interrogatories was a spreadsheet listing five categories, A, B, C, D, and E, containing the same titles as those in the spreadsheet attached to DMJM's August 18, 2008, Supplemental Answers to Interrogatories. The amounts identified under each category were, however, different. Under category A, "[o]riginal A/E Services Agreement and Agreement Modification(s)," DMJM listed the unpaid contract amount claimed as $782,577.78. Under the remaining categories, DMJM listed the following amounts as "Proposal Amounts":

 B. Submitted, Negotiated, But No Contract Modification Executed: $288,518.32

 C. Submitted, Not Negotiated or Authorized: $84,578.87

 D. Submitted, Informally Authorized, No Contract Modification Executed: $18,586.34

 E. Pending, Not Submitted Before County Filed Lawsuit: $999,453.06.

The spreadsheet contained an additional category, "F," titled "Subtotal, Additional Services," and under "Proposal Amount" DMJM listed $1,391,136.59. On the spreadsheet, DMJM listed the following totals:

Total Earned Fees: $6,176,888.95

Total Paid Fees: $4,003,174.58

Total Unpaid Fees: $2,173,714.37.

This spreadsheet was also attached to the County's Motion for Partial Summary Judgment and admitted into evidence at trial as the County's Exhibit 173A.

On April 21, 2009, DMJM filed an Amended Counterclaim for breach of contract, seeking an award of $2,175,000 in unpaid fees, and payment of prejudgment and postjudgment

interest. On April 24, 2009, the County filed a Motion for Partial Summary Judgment and Memorandum in Support thereof, requesting that the trial court dismiss DMJM's claim for additional services on the following two grounds:

(1) DMJM's Amended Counterclaim against Baltimore County was deficient as a matter of law because DMJM claimed damages for additional services above its base contractual amount, and the Maryland Annotated Code, the Baltimore County Charter, the Baltimore County Code, and well established Maryland case law prohibit contractual claims against local governments for any amounts above the amount set forth in the written contract approved by the governing body of the local government; and

(2) DMJM's Amended Counterclaim was barred by the one-year statute of limitations set forth in Md.Code Ann. Art. 25A, § 1A.

DMJM filed an Opposition, and following a hearing, the trial court denied the County's Motion for Partial Summary Judgment.[4]

On May 1, 2009, the County filed Motions *in limine* seeking, in part, to preclude evidence of damages in excess of the contract amount. Specifically the County sought to preclude DMJM from introducing evidence of the claim for additional services. The circuit court denied the County's motion.

A trial was held from June 1, 2009, to July 10, 2009. At trial, DMJM introduced into evidence an amended spreadsheet which purported to explain the claim for $2,159,077.79 in total unpaid fees, including the request for $1,471,498.95 for additional services. The spreadsheet, admitted at trial as DMJM's Exhibit 506, contained the same five categories, A, B, C, D, and E, as the spreadsheet attached to DMJM's first and second supplemental answers to interrogatories, and the County's Motion for Partial Summary Judgment, titled:

---

4. The trial court gave no reason in its Order for the denial of the County's Motion for Partial Summary Judgment.

A. Original A/E Services Agreement and Agreement Modification(s)

B. Submitted, Negotiated, But No Contract Modification Executed

C. Submitted, Not Negotiated or Authorized

D. Submitted, Informally Authorized, No Contract Modification Executed

E. Pending, Not Submitted Before County Filed Lawsuit.

Under category A, "[o]riginal A/E Services Agreement and Agreement Modification(s)." DMJM listed the "Unpaid Contract Balance" as $687,578.84. Under the remaining categories, DMJM listed the following amounts as "Proposal Amounts":

B. Submitted, Negotiated, But No Contract Modification Executed: $288,976.32

C. Submitted, Not Negotiated or Authorized: $159,488.86

D. Submitted, Informally Authorized, No Contract Modification Executed: $15,500.02

E. Pending, Not Submitted Before County Filed Lawsuit: $1,007,533.75.

The spreadsheet contained category "F," titled "Subtotal, Additional Services," and under "Proposal Amount" listed $1,471,498.95. On the spreadsheet, DMJM listed the following totals:

Total Earned Fees: $6,257,251.31
Total Paid Fees: $4,098,173.52
Total Unpaid Fees: $2,159,077.79.

At trial, Edward P. Blades, a Budget Analyst with the Office of Budget and Finance, testified that as of February 23, 2004, Baltimore County had already paid DMJM $4,098,000 under the contract. Blades testified that if he had received a request for payment above the amended contract amount, he could not have authorized the payment.

At the end of its case in chief, the County moved for judgment as to DMJM's claim for additional services, citing

the reasons set forth in the County's Motion for Partial Summary Judgment. The trial court denied the motion for judgment. At the conclusion of DMJM's case and at the conclusion of all of the evidence, the County renewed the motion for judgment on the same grounds. The trial court denied both motions.

DMJM requested a Jury Instruction on Prejudgment Interest, and the trial court refused to give the instruction. The requested instruction read as follows:

> The purpose of prejudgment interest is to compensate an aggrieved party for the loss of the use of the sum found due it and the loss of income from such funds. Prejudgment interest is allowable as a matter of right when the obligation to pay and the amount due had become certain and definite by a specific date prior to the judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of the fixed amount as of a known date. If you find that the County deprived DMJM of a definite sum on either its contract and/or additional services, you may, but are not required to, award prejudgment interest from the date upon which you determine the County's obligation to pay, and the amount, were certain. Your decision on whether to award prejudgment interest must be based on your view of equity and justice appearing between the parties and a consideration of all the circumstances in this case.

After giving the jury instructions, the trial court at a bench conference asked counsel: "Each party wish[es] to adopt and incorporate by reference all arguments advanced before I gave the instructions, is that correct?" All counsel agreed.

The jury found that DMJM had not breached the contract with the County, and that DMJM had not been negligent in rendering architectural/engineering services to the County. The jury found that the County breached the contract and awarded DMJM $1,653,600.88 in damages.

On July 27, 2009, DMJM submitted a Memorandum in Support of Prejudgment Interest. The County filed an oppo-

sition. On August 10, 2009, the County filed a Notice of
Appeal and on August 20, 2009, DMJM filed a Notice of
Appeal. On September 4, 2009, DMJM filed a Motion to
Revise Judgment and to Strike [the County]'s Notice of
Appeal. On September 11, 2009, the trial court entered an
Order denying DMJM's Request for Award of Prejudgment
Interest, and denying DMJM's Motion to Revise the Judg-
ment and to Strike [the County's] Notice of Appeal.[5]

On August 12, 2010, during the pendency of the appeal, the
parties entered into a Settlement Agreement and Partial
Release, in which the County agreed to pay DMJM's "claim
for base contract services in the amount of $687,579.00, plus
10% post-judgment interest calculated from July 14, 2009, to
August 14, 2010, (13 months), for a total of $762,066.72, in full
and final satisfaction of DMJM's claim for said base contract
services and for all post-judgment interest on that part of the
judgment." The parties agreed that on appeal they would
"not raise any issues that challenge or otherwise question the
portion of the judgment for base contract services in the
amount of $687,579.00, the court's entry of summary judgment
in favor of DMJM on certain counts, or the jury verdict in
favor of DMJM on Baltimore County's affirmative claims."
The County reserved its right "to challenge the remainder of
the judgment for additional services in the amount of

---

**5.** In the trial court's September 11, 2009, Order denying DMJM's claim
for prejudgment interest, the trial judge stated:

The Court finds that none of the written agreements between the
parties contained a provision mandating or even allowing an award
of prejudgment interest under these circumstances; and that the
claims of [DMJM] were not liquidated claims for sums certain.
Rather, the amount of [DMJM]'s claims were never settled as to
amount until closing argument; its witnesses made concessions dur-
ing testimony which, had those concessions been properly argued by
the [County], may well have resulted in substantial credits being
applied to [DMJM]'s recovery; and generally, the [County] raised
colorable grounds to have disputed all or part of the claims advanced
by [DMJM] in its Amended Counterclaim. An award of prejudgment
interest would be contrary to the purpose which the law recognizes in
allowing interest awards in such matters and contrary to the interests
of justice.

$966,022.00 and to oppose DMJM's claims for prejudgment interest on the entire amount of the Counterclaim judgment."

## DISCUSSION

### I.

### *(A) Standard of Review*

The parties dispute the applicable standard of review. The County points out that the denial of a motion for summary judgment is generally subject to *de novo* review. The County contends, however, that a different standard governs the denial of a motion for summary judgment that is followed by a trial. The County argues that the correct standard of review in the latter scenario is whether the party moving for judgment at the conclusion of evidence in the trial is entitled to judgment as a matter of law on the record as it stands at that time.

DMJM argues that the standard of review is *de novo* and that review is extremely narrow, with the appellate court limited to review of purely legal issues. DMJM argues that the County's proposed standard of review suggests that we review legal issues *de novo,* as well as, the sufficiency of the evidence to support the verdict. DMJM argues that the issue of sufficiency of the evidence to support the verdict is not before this Court, and we are precluded from consideration of evidence introduced at trial.

It is well settled that, "[t]his Court utilizes a *de novo* standard to analyze questions regarding a circuit court's interpretation of statutory provisions. Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not. Where the order involves an interpretation and application of Maryland statutory and case law, we must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Powell v. Breslin,* 195 Md.App. 340 (2010), *cert. granted,* 418 Md. 190, 13 A.3d 798 (2011) (internal quotations and citations omitted).

The standard of review that governs appellate review of the denial of a motion for judgment after trial was explained by the Court of Appeals in *Adams v. Manown*, 328 Md. 463, 472, n. 4, 615 A.2d 611 (1992):

> Given that a circuit court has the discretion to deny a motion for summary judgment, even though the record on summary judgment would support grant of the motion at that time, the correct mode of analysis here is to determine whether the party moving for judgment at the conclusion of trial is entitled to judgment as a matter of law on the record as it stands at that time.

(Internal citations omitted).

In ruling on a motion for judgment pursuant to Maryland Rule 2–519 in a jury trial, "[t]he trial judge must consider the evidence, including the inferences reasonably and logically drawn therefrom, in the light most favorable to the party against whom the motion is made. If there is any evidence, no matter how slight, legally sufficient to generate a jury question, the motion must be denied. . . ." *Barrett v. Nwaba*, 165 Md.App. 281, 289, 885 A.2d 392 (2005) (citations and internal quotations omitted) (emphasis omitted). "We review a trial court's grant of a motion for judgment under the same analysis used by the trial court. In other words, we assume the truth of all credible evidence on the issue, and all fairly debatable inferences therefrom, in the light most favorable to the party against whom the motion is made." *Id.* at 290, 885 A.2d 392 (citations and internal quotations omitted).

### (B) The Merits

The County argues that the trial court erroneously denied its Motion for Judgment at the conclusion of the trial as to DMJM's claim for additional services because there was no written contract amendment approved by the County Council obligating the County to pay for the services. The County explains that any amendment to the contract was required by Article 4 and Article 21.1 of the contract to be in writing and approved by the County Council, and the Council did not

approve an amendment for the payment of the claimed additional services. The County points out that an examination of the captions in DMJM's spreadsheets demonstrate that DMJM was aware of the need for an amendment for the additional services to obligate the County for payment of the services, and was aware that the Council did not execute such an amendment.

The County maintains that three legal reasons compel the conclusion that the trial court erred in denying its motions for judgment: (1) the plain meaning of the contract; (2) the plain meaning of the applicable Baltimore County Charter and Baltimore County Code ("B.C.C.") sections; and (3) relevant case law.

First, the County argues that the contract language itself provides that any changes to the contract shall be made by written modification and that no compensation for additional services will be charged without authorization of the County.

Second, the County contends that a county or municipality may make a contract only in the manner prescribed by the legislature, and "if the essential formalities are lacking, the contract is invalid and unenforceable." The County argues that Baltimore County Charter § 715, § 402, § 508 and B.C.C. §§ 10–2–304, 10–2–306, 10–2–107, "set forth the process which must be complied with in obtaining requisite 'approval and proper execution of the contract documents' so as to form a legally binding contract with Baltimore County." The process, as described by the County, is that: (1) County Council approval is required; (2) the County Executive or the County Administrative Officer is required to sign any contract on behalf of the County; and (3) the Director of Budget and Finance must first certify that funds for the designated purpose are available. The County points out that DMJM and the County previously entered into a properly executed contract amendment, thus proving DMJM was aware of the need for a properly executed contract amendment, and participated in the amendment process.

Third, relying primarily on *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs.*, 155 Md.App. 415, 425, 843 A.2d 252 (2004), the County argues relevant case law establishes the proposition that "a governmental entity, unlike a private corporation may never have an obligation imposed upon it to expend public funds except in the formal manner expressly provided by law." The County contends that those who contract with governmental agencies in Maryland are deemed to be on notice of the applicable procedures and requirements and the risk of non-compliance with these requirements and procedures is "borne on the other party, not the government."

In contrast, DMJM argues that the County is bound to pay for the additional services as the B.C.C. expressly allows changes to existing contracts without the formal approval of the County Council, and that under the B.C.C. only "purchase orders" and "contracts" as a whole can be void *per se* so as to create "no obligation or liability." DMJM contends that, in general, counties are bound by their contracts and the additional services DMJM performed on the project in this case were within the ambit of the approved contract and the changes clause therein. DMJM maintains the County's assertion of non-liability for the additional services is subject to estoppel.

Notwithstanding DMJM's positions, for the reasons below, we agree with the County that the contract language, the Baltimore County Charter and B.C.C., and relevant case law mandate reversal and explain.

### (1) The Contract Language

The plain language of the contract required written authorization from the County Council to obligate the County for payment of the additional services. Appellate courts take "an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation." *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 86, 5 A.3d 683 (2010) (citing *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d

700 (2007)). When interpreting a contract, we are confined to "the four corners of the agreement," and we "ascribe to the contract's language its 'customary, ordinary, and accepted meaning.' " *Id.* (citing *Cochran*, 398 Md. at 17, 919 A.2d 700; *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001) (internal quotation marks and citation omitted)). We do not consider the subjective intent of the parties, rather we consider "the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation." *Id.* (citing *Cochran*, 398 Md. at 17, 919 A.2d 700). As such, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. The language of a contract is only ambiguous if, when viewed from this reasonable person perspective, that language is susceptible to more than one meaning." *Id.* at 86–87, 5 A.3d 683 (internal quotation marks and citations omitted).

In this case, Article 4.1 of the contract states that: **"The County** may, at any time, by written order, make changes within the general scope of this agreement in the services or work to be performed." (Emphasis added). Article 4.1 provides that: "If such changes cause an increase or decrease in the Architect's cost of, or time required for, performance of any services under this Agreement, whether or not changed by any order, an equitable adjustment shall be made and this Agreement shall be modified in writing accordingly." Article 4.1 also states that: **"Any claim of the Architect** for adjustment under this clause must [be] asserted in writing within thirty (30) days from the date of receipt by the Architect of the notification of changes unless the County grants a further period of time before the date of final payment under this agreement." (Emphasis added).

On appeal, DMJM has identified no word or phrase in Article 4.1 which it alleges to be ambiguous. The plain meaning of the clause is clear and unambiguous—the County, by written order could make changes in the work or services to be performed by DMJM. If those changes caused an increase or decrease in the cost of the contract, an equitable

adjustment would be made and the contract modified in writing accordingly. Any adjustment claims sought by DMJM, under Article 4.1 were required to be asserted in writing within thirty (30) days of DMJM's receipt of notification of changes by the County.

Article 4.2 of the contract states in simple and unambiguous language that: "No services for which an additional compensation will be charged **by the Architect** shall be furnished without the written authorization of the County." (Emphasis added). DMJM has identified no language in Article 4.2 which it contends is unclear or subject to dual interpretation. It is clear that the phrase "no services" contained in Article 4.2 extends beyond the changes in services or work potentially made by the County pursuant to the written order referenced in Article 4.1, and includes any and all services for which DMJM might seek additional compensation. The meaning of Article 4.2 is clear—DMJM could charge for no additional services without written authorization of the County.

Article 7.2, relating to payment of the direct labor costs,[6] provides: "Direct Labor Costs ... shall not exceed a total value of *Four Million, Five Hundred Sixteen Thousand, Seven Hundred Seventy–Nine and 16/100 Dollars ($4,516,-779.16)* unless authorized by properly executed [7] amendment." (Footnote added). Once more when faced with the plain meaning contention of the County, DMJM has identified no ambiguous language in Article 7.2 which permits the amount payable under the contract to exceed $4,516,779.16, absent a properly executed amendment.[8] The meaning of

---

**6.** Pursuant to Article 7.2, "Direct Labor Costs" include actual salaries paid to productive employees before tax and other deductions and does not include overhead expenses, administrative support time, payroll taxes, workmen's compensation and/or other insurances summary of the total Professional Fee and Other Direct Costs.

**7.** Executed is defined as, "( [of] a document) that has been signed," or "[t]hat has been done, given, or performed." Black's Law Dictionary, 609 (8th Ed.1999).

**8.** On September 19, 2005, the parties entered into a properly executed amendment to the contract. Pursuant to this amendment, the contract

Article 7.2 is clear—without an amendment to the agreement signed by the parties, the cost of the contract to the County could not be greater than $4,516,779.16.

Article 21.1, entitled "Special Causes, Council Approval," states that DMJM by entering into the contract "covenants that this Agreement is subject to and in compliance with provisions of § 715 of the Baltimore County Charter, Article VII, title, 'Budgetary and Fiscal Procedures.'" Charter § 715 provides that: "Any contract, must be approved by the county council before it is executed if the contract is: ... For services for a term in excess of two years or involving the expenditure of more than $25,000 per year or such amount or term as may be set by legislative act of the county council." By a plain reading of Article 21.1 and Charter § 715, in signing the contract, DMJM agreed that any contract for services lasting more than two years or for a cost of more than $25,000 per year must be approved by the County Council.

Under the objective approach to contract interpretation, the inquiry as to the meaning of the language of the contract is restricted to the four corners of the agreement, and as such, the customary, ordinary, and accepted meaning of the language of the contract is assigned to it. *Ocean Petroleum Co.,* 416 Md. at 86, 5 A.3d 683. In this case, the language of the contract is unambiguous—that is, the language is not susceptible to more than one meaning—when viewed from the perspective of a reasonable person in the position of the parties. Based on a plain reading of the document, in simplest terms, DMJM did not comply with the procedures outlined under the contract for seeking compensation for additional services. There is no merit to DMJM's position that the contract allowed for the County to be obligated to pay for additional services beyond those authorized by a properly executed written amendment, approved by the County Council.

---

value was increased to $4,785,752.36. This was the only properly executed amendment to the contract. Article 7.11 provided that final payment to DMJM would be made "upon completion and acceptance of the professional services specified under the terms of this agreement."

### (2) Charter and B.C.C. Provisions

The plain meaning of the relevant provisions of the Baltimore County Charter and the B.C.C. support the conclusion that an enforceable contract amendment required approval by the County Council. As discussed above, Article 21.1 of the contract provides that DMJM agreed to comply with Charter § 715, titled, "[a]ppropriation control and certification of funds." In pertinent part, Charter § 715 provides:

> No office, department, institution, board, commission, or other agency of the county government shall, during any fiscal year, expend or contract to expend any money or incur any liability or enter into any contract which by its terms involves the expenditure of money, for any purpose, in excess of the amounts appropriated or allotted for the same general classification of expenditure in the budget for such fiscal year or in any supplemental appropriation as hereinabove provided. No such payment shall be made nor any obligation or liability incurred, except for small purchases in an amount less than one hundred dollars, or such amount as may be set by legislative act of the county council, unless the director of finance shall first certify that the funds for the designated purpose are available. Any contract, verbal or written, made in violation of this section shall be null and void, and if any officer, agent or employee of the county shall knowingly or willfully violate this provision, such action shall be cause for his removal from office by a majority of the total number of county council members established by this Charter.

> Nothing in this section or elsewhere in this Charter shall prevent the making of contracts of lease or contracts for services providing for the payment of funds at a time beyond the fiscal year in which the contracts are made, provided that the nature of such transactions reasonably requires the making of such contracts. Any contract, **must be approved by the county council before it is executed if the contract is:**

> . . . .

(3) For services for a term in excess of two years or involving the expenditure of more than $25,000 per year or such amount or term as may be set by legislative act of the county council.

The county council shall define the term services as used in this section.

(Emphasis added).

In addition to Charter § 715, the B.C.C. sections relevant to this matter are: § 10–2–304, § 10–2–306 and § 10–2–107. B.C.C. § 10–2–304, titled, "Certification by the Director of Budget and Finance," states that: "An order for purchases of services or commodities estimated to exceed $1,000 may not be issued until the Director of Budget and Finance shall first certify that funds for the designated purpose are available."

B.C.C. § 10–2–306, specifically titled, "Contracts" provides:

**(a) *In general.* Except as otherwise provided by law, all contracts, including professional capital improvement services contracts, shall be signed on behalf of the county by the County Executive[9] or the County Executive's designee approved by the County Council.**

(b) *Contracts of $25, 000 or less.*

(1)(i) The County Executive may delegate the authority to sign contracts of $25,000 or less to the Director of Budget and Finance.

(ii) On receiving the delegation authorized under subparagraph (i) of this paragraph, the Director may delegate the authority to sign contracts of $25,000 or less to a designee as evidenced by a written designation signed by the Director.

(2) Unless otherwise provided in the Purchasing Manual, a contract of $25,000 or less shall also be signed by the Director of the Department or office initiating the contract.

(c) *Contracts formalities.* All contracts shall be:

---

9. Baltimore County Charter § 402 provides the duties of the County Executive. (Bill No. 43, 1974, § 1; Bill No. 58, 1976, § 1).

(1) Forwarded to the Director of Budget and Finance for certification in accordance with § 715 of the Charter, a copy of which shall be retained by Director; and

(2) Approved by the County Attorney[10] in accordance with § 508 of the Charter.

(Emphasis added) (italics in original) (footnotes added).

B.C.C. § 10–2–107, titled, "Unauthorized Purchases" provides:

(1) Except as provided in this title, a county officer or employee may not order the purchase of any commodities, services, or professional capital improvement services except under the requirements and conditions of this title.

(2) A purchase order or contract made contrary to the provisions of this title:

(i) Shall be of no effect and void; and

(ii) Creates no obligation or liability for the county.

We find the plain meaning of Charter § 715 and the B.C.C. sections to be clear and unambiguous. The sections require contracts to be approved by the County Council. Once more, DMJM has identified no words or phrases in the relevant Charter and B.C.C. sections that it contends are unclear.

Mindful of DMJM's contention that approval by the County Council was not required for an amendment to the contract, we will explore the legislative history of Charter § 715, B.C.C. § 10–2–304 and § 10–2–306. The legislative history of Charter § 715, B.C.C. § 10–2–304 and § 10–2–306 supports the conclusion that it was indeed the intent of the County Council that its approval be required for binding contracts with the County for services involving the expenditure of more than $25,000 per year and for amendments to those contracts. The discernable legislative history of § 715 reveals that the Charter section was enacted in 1978, by Bill No. 86, 1978, § 1, and

---

**10.** Baltimore County Charter § 508 provides the "powers and duties" of the county attorney. (Bill No. 172, 1981, § 1) (Approved by voters Nov. 2, 1982; effective Dec. 3, 1982).

was amended in 1982 by Bill No. 117, 1982, § 1, and in 1990 by Bill No. 129, 1990, § 3.[11]

In 1978 by Bill No. 86, Charter § 715 was enacted with the following language:

*Any contract must be approved by the county council before it is executed if the contract is: (1) for the purchase of real or leasehold property where the purchase price of the property is in excess of $5,000; (2) for the lease of real or leasehold property ... IN EXCESS OF $25, 000 IN THE AGGREGATE[;] (3) for services for a term in excess of two years; or (4) for services involving the expenditure of more than $25,000 per year.*

(Emphasis added) (italics in original). Bill No. 86 explained that the purpose of the repeal and reenactment of Charter §§ 701–716 was "to clarify certain contract approval by county council; AND ... TO GIVE ADVANCE NOTICE TO THE COUNTY EXECUTIVE AND THE COUNTY COUNCIL IN CONNECTION WITH ALL CAPITAL PROJECTS EXCEEDING $25,000...." (Emphasis in original).

In 1982, in Bill No. 117, Charter § 715 was amended to separate the requirements that County Council approval is required where the contract is for services in excess of two years or involving expenditure of more than $25,000.00 per year, as follows:

Any contract must be approved by the county council before it is executed if the contract is: ...

[ (3) For services for a term in excess of two years; or]

[ (4) For services involving the expenditure of more than $25,000.00 per year.]

(Emphasis in original). In 1982, Charter § 715 was also amended to include the following:

---

11. Charter § 715 was amended in 1990 by Bill No. 132, § 2, 1990, amending provisions which dealt with binding arbitration. We are aware that Charter § 715 was also amended in 1998 by Bill No. 82, 1998 § 1, although we are unable to locate the substance of that Bill, the present version of Charter § 715 is as set forth above.

> No office, department, institution, board, commission, or other agency of the county government shall, during any fiscal year, expend or contract to expend any money or incur any liability or enter into any contract which by its terms involves the expenditure of money, for any purpose, in excess of the amounts appropriated or allotted for the same general classification of expenditure in the budget for such fiscal year or in any supplemental appropriation as hereinabove provided. No such payment shall be made nor any obligation or liability incurred, except for small purchases in an amount less than ~~FIVE~~ [one] hundred dollars, OR SUCH ~~HIGHER~~ AMOUNT AS MAY BE SET BY LEGISLATIVE ACT OF THE COUNTY COUNCIL, unless the director of finance shall first certify that the funds for the designated purpose are available. Any contract, verbal or written, made in violation of this section shall be null and void, and if any officer, agent or employee of the county shall knowingly or willfully violate this provision, such action shall be cause for his removal from office by a majority of the total number of county council members established by this Charter.

(Emphasis in original). At that time, the County Council stated the purpose of the amendment was to provide *"that the dollar limit on small purchases which do not require certification by the Director of Finance may be changed by legislative act of the County* Council[.]" (Emphasis in original).

In 1990, in Bill No. 129, Charter § 715 was amended to include the following language:

> Any contract ... must be approved by the county council before it is executed if the contract is: ...
>
> (3) For services for a term in excess of two years or involving expenditure of more than $25,000.00 per year, OR SUCH AMOUNT AS MAY BE SET BY LEGISLATIVE ACT OF THE COUNTY COUNCIL.

(Emphasis in original). The County Council stated the purpose of the amendment was to authorize "the County Council

to determine the type and amount of contracts requiring Council approval."

The text of B.C.C. § 10–2–304 and § 10–2–306 was previously contained in B.C.C. § 26–7, titled "Contract procedure" [12] which stated:

(i) . . . ALL CONTRACTS INCLUDING CAPITAL IMPROVEMENT CONTRACTS OVER $25,000.00 SHALL BE SIGNED ON BEHALF OF THE COUNTY BY THE COUNTY EXECUTIVE. THE COUNTY EXECUTIVE MAY DELEGATE SUCH AUTHORITY FOR SUCH CONTRACTS OF $25,000.00 OR LESS TO THE DIRECTOR OF THE OFFICE OF CENTRAL SERVICES IN CONJUNCTION WITH THE DIRECTOR OF THE DEPARTMENT OR OFFICE INITIATING THE CONTRACT. ALL CONTRACTS SHALL BE FORWARDED TO THE DIRECTOR OF THE OFFICE OF FINANCE FOR CERTIFICATION PURSUANT TO SECTION 715 OF THE CHARTER, AND BE APPROVED BY THE COUNTY ATTORNEY PURSUANT TO SECTION 508 OF THE CHARTER.

(Emphasis in original).

The legislative history of B.C.C. § 26–7 is contained in Bill No. 171, 1989, § 1, in which the County Council explained that the purpose of Title 26 was to provide "the rules and regulations for purchasing," to explain "contract procedure," and to identify the "power and duties of the purchasing agent[.]"

In 1995, B.C.C. § 26–7 was recodified into B.C.C. § 15–84. Bill No. 69–95, § 6, 1995. B.C.C. § 15–84, titled "Contract procedure," contained the following language:

(b)(9) All contracts shall be signed on behalf of the county by the county executive wherever required by law. . . . All contracts including capital improvement contracts over twenty-five thousand dollars ($25,000.00) shall be signed on

---

12. The text of B.C.C. § 10–2–304 and § 10–2–306, as codified in B.C.C. § 26–7, was originally enacted in 1988. In 2003, the format of the B.C.C. was changed to identify each code section by three numbers, representing, article, title, and section, respectively.

behalf of the county by the county executive OR DESIG-NEE APPROVED BY COUNCIL. The county executive may delegate such authority for such contracts of twenty-five thousand dollars ($25,000.00) or less to the director of the office of [central services] FINANCE in conjunction with the director of the department or office initiating the contract. All contracts shall be forwarded to the director of the office of finance for certification pursuant to Section 715 of the Charter AND A COPY SHALL BE RETAINED BY THEM, and be approved by the county attorney pursuant to section 508 of the Charter.

(Emphasis in original). The legislative history of B.C.C. § 15–84 is contained in Bill No. 69–95, § 6, 1995, which provided that the purpose of the bill was to explain generally "the duties, functions, responsibilities and authorities of the offices, departments and personnel of the Baltimore County government."

In 1996 B.C.C. § 15–84 was amended, pursuant to Bill No. 49–96, § 7, 1996, to include the following language:

(9) All contracts shall be signed on behalf of the county by the county executive wherever required by law. All contracts including capital improvement contracts over twenty-five thousand dollars ($25,000.00) shall be signed on behalf of the county by the county executive or designee approved by the council. The county executive may delegate such authority for such contracts of twenty-five thousand dollars ($25,000.00) or less to the [director of the office of finance] DIRECTOR OF BUDGET AND FINANCE in conjunction with the director of the department or office initiating the contract. All contracts shall be forwarded to the [director of the office of finance] DIRECTOR OF BUDGET AND FINANCE for certification pursuant to section 715 of the Charter and a copy shall be retained by them, and be approved by the county attorney pursuant to section 508 of the Charter.

(Emphasis in original). Bill No. 49–96, § 7 stated that one of its purposes was to explain the "duties, functions, responsibili-

ties and authorities of the offices, departments and personnel of the Baltimore County government."

The legislative history of Baltimore County Charter § 715, B.C.C. § 10–2–304 and § 10–2–306 clearly demonstrates that the County Council's intent was to create a process by which County Council approval is required prior to the execution of a contract for services involving a term in excess of two years or the expenditure of more than $25,000 per year or such amount as may be set by legislative act of the County Council. There is no indication that the County Council intended to exempt, from the County Council approval requirement, contract amendments where services exceed a cost of $25,000 or the two year duration. When Charter § 715 was enacted in 1978, in Bill No. 86, the County Council explicitly stated that the purpose of Bill No. 86 was to provide the Council advance notice of all capital projects exceeding $25,000. Charter § 715 also provides that no office, department, board, commission, or agency of the County can contract to expend funds without the Director of Finance first certifying that the funds for the designated purpose are available. B.C.C. § 10–2–306 requires compliance with Charter § 715 stating that all contracts must be sent to the Director of Budget and Finance for certification that the County has the funds available.

Since 1978, the Charter has required County Council approval of contracts, and hence notice, of capital projects exceeding $25,000 per year, as well as, certification from the Director of Budget and Finance that the funds are available for such projects. To interpret Charter § 715, B.C.C. § 10–2–304 and § 10–2–306, as not applying to contract amendments which exceed $25,000 per year or two years in duration would allow entities to contract with the County for one amount, approved by the County Council, and later amend the contract price in excess of $25,000 without County Council approval and certification from the Director of Budget and Finance that the funds are available, thereby circumventing the County Council approval process. This could not have been the intent of the County Council. The plain meaning of Charter § 715, B.C.C. § 10–2–304 and § 10–2–306 and their legislative histo-

ry support the conclusion that the County Council intended its approval as a requirement for all capital projects exceeding $25,000 per year or a term in excess of two years, including contracts and contract amendments.

Relying on B.C.C. § 10–2–504, DMJM wrongly contends that the B.C.C. "expressly allows changes to existing contracts without formal approval of the County Council." We find no merit to DMJM's position. B.C.C. § 10–2–504 provides:

(a) *Changes—Capital improvement contract.* If it becomes necessary to modify the plans and specifications for an ongoing capital improvement contract to an extent which will require an additional expenditure of more than 20% of the contract bid price, in the aggregate, the Director of Public Works promptly shall prepare and submit through the County Administrative Officer to each member of the County Council a report explaining:

(1) The changed or additional construction, within the scope of the contract;

(2) The costs of the change; and

(3) The reasons for the change.

(b) *Same—Professional capital improvement services contract.* If a professional capital improvement services contract previously approved by the County Council requires an increase over the original contract price, the Director of Public Works promptly shall prepare and submit through the County Administrative Officer to each member of the County Council a report explaining:

(1) The change in the professional capital improvement services contract;

(2) The costs of the change; and

(3) The reasons for the change.

(c) *County may proceed after 7 days.* If, after 7 days after the date the report is actually delivered to the Council members, the County Administrative Officer has not received notice from any Council member to the contrary, the Department of Public Works may proceed with the change in plans or amend the professional services contract.

(Emphasis in original). Pursuant to B.C.C. § 10–2–504(b), where a professional capital improvement services contract previously approved by the County Council requires an increase in cost over the original contract price, the Director of Public Works shall prepare a report, which is submitted to each member of the County Council. In the report, the Director of Public Works is required to explain: (1) the change in the professional capital improvement services contract; (2) the costs of the change; and (3) the reasons for the change. B.C.C. § 10–2–504(c) provides that "[i]f after 7 days after the date of the report is actually delivered to the Council members, the County Administrative Officer has not received notice from any Council member to the contrary, the Department of Public Works may proceed with amending the professional services contract."

The plain meaning of B.C.C. § 10–2–504 requires that notice be provided to the County Council of changes in capital improvement services contracts that exceed the original contract price. The legislative history of B.C.C. § 10–2–504, contained in Bill No. 125–94, § 1, 1994, reveals that the section was enacted in 1988. According to its legislative history B.C.C. § 10–2–504 was enacted "[for] the purpose of amending the purchasing law to provide for reporting to the county council an increase in a professional services contract." Bill No. 125–94, § 1, 1994. Based on the plain meaning of B.C.C. § 10–2–504, and an examination of its legislative history, B.C.C. § 10–2–504 does not allow changes to existing contracts, which increase the contract price without notice to and the acquiescence of the County Council.[13]

---

13. In this case, there is no indication that the County employed the process set forth in B.C.C. § 10–2–504 to effect a change in the contract price. To the extent that DMJM contends that the B.C.C. works an unjust result because it allows the County to act unilaterally to notify the County Council of contract amendments, we conclude this argument is not persuasive. DMJM had prior contracts with the County and participated in the bid process for this contract. By the very terms of the contract, DMJM agreed County Council approval would be required for amendments. As we held in *Alternatives Unlimited, Inc.*, 155 Md.App. at 425–26, 452, 843 A.2d 252, the law imputes to the party

### (3) Relevant Case Law

▆▆▆▆▆ Relevant case law supports the conclusion that the County may contract only by the method prescribed by the legislature. Case law is clear that, "a governmental entity, unlike a private corporation, may never have an obligation imposed upon it to expend public funds except in the formal manner expressly provided by law." *Alternatives Unlimited, Inc.,* 155 Md.App. at 425, 843 A.2d 252. "It is well settled that a county or municipality can make a contract **only** in the manner prescribed by the legislature.... This rule is strict; if the municipality's charter provisions are not precisely followed during the contracting process, the contract is *ultra vires,* or outside the power of the municipal corporation to make, and void *ab initio.*" *State of Maryland Comm'n on Human Rels. v. Baltimore City Dep't of Rec. and Parks,* 166 Md.App. 33, 41–42, 887 A.2d 64 (2005) (internal quotations and citations omitted) (emphasis in original).

In *Gontrum v. Mayor & City Council of Baltimore,* 182 Md. 370, 375, 35 A.2d 128 (1943), the seminal case setting forth the principle that a government entity may never have an obligation imposed upon it except in the formal manner expressly provided by law, the Court of Appeals stated:

> It is a fundamental principle of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority. *Dillon's Municipal Corporations,* 5th Ed., Sec. 777. A municipal corporation is not bound by a contract made in its name by one of its officers or by a person in its employ, although within the scope of its corporate powers, if the officer or employee had no authority to enter into such a contract on behalf of the corporation. 38 *Am.Jur., Municipal Corporations,* p. 183.

---

contracting with a municipality knowledge of the limitations of the County to contract, and when a party has previously contracted with the municipality actual knowledge can be inferred. We perceive no basis on which to depart from that principle in this case.

Section 1268 of *McQuillin's Municipal Corporations*, 2d Ed., states that "The general rule is well settled and is constantly enforced that one who makes a contract with a municipal corporation is bound to take notice of limitation of its powers to contract and also of the power of the particular officer or agency to make the contract."

Following *Gontrum*, in *Hanna v. Board of Education*, 200 Md. 49, 52, 58, 87 A.2d 846 (1952), the Court of Appeals found that a contract between a construction company and the Board of Education of Wicomico County for the construction of a high school was null and void as the contract violated a section of the Maryland Public Education Law, which required competitive bidding on contracts. Citing *Gontrum*, 182 Md. at 375, 35 A.2d 128, the Court explained that: "The rule is firmly established that one who makes a contract with a municipal corporation or administrative agency is bound to take notice of the limitations of its powers to contract." *Hanna*, 200 Md. at 57, 87 A.2d 846. The Court found that, because the contract was in violation of the statute, it was null and void. *Id.* at 58, 87 A.2d 846.

Speaking for this Court, in *Alternatives Unlimited, Inc.*, 155 Md.App. at 425–26, 843 A.2d 252, Judge Charles E. Moylan, Jr. explained the rationale of *Gontrum:*

The overarching principle of *Gontrum* is that a governmental entity, unlike a private corporation, may never have an obligation imposed upon it to expend public funds except in the formal manner expressly provided by law. There is no exemption from this rule because of any apparent authority of one of its agents to bind the governmental entity. There is imposed on any party dealing with the governmental entity, moreover, an absolute responsibility 1) to know the limitations on the powers of the agent to contract on behalf of the governmental entity and 2) to be familiar with and bound by "the power of the particular officer or agency to make the contract" in question.

Judge Moylan explained:

The basic principle for which *Gontrum* stands is that the

public fisc,[14] and thereby the public itself, is to be protected by stringent procurement procedures not only against outside parties, such as Alternatives, but even against its own agents and employees, . . .

. . . .

> A municipal corporation cannot be held liable for the unauthorized acts of its agents although done officii colore, without some corporate act of ratification or adoption; and, from consideration of public policy, it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officials, than to adopt a rule, which, through improper combinations and collusion, might be turned to the detriment and injury of the public.

[*Gontrum,*] 182 Md. at 376 [35 A.2d 128] (emphasis supplied). The protection of the public unhesitatingly "trumped" fairness to the plaintiff.

. . . .

As Judge Glynn observed, "the rule in *Gontrum* is harsh." There are, however, sound policy reasons for that harshness.

*Id.* at 467–69, 843 A.2d 252 (emphasis omitted) (footnote added).

Recently, in *State of Md. Comm'n on Human Relations,* 166 Md.App. at 41, 887 A.2d 64, we held that a trial court did not err in finding a settlement agreement between the Commission and Baltimore City void, as the agreement was beyond the power of the officials to enter when they had not followed prescribed procedures. In that case, the Commission proceeded against the City on a complaint that parts of a city building were not wheelchair accessible. *Id.* at 36, 887 A.2d 64. City officials negotiated a settlement embodied in a Consent Judgment. *Id.* at 37, 887 A.2d 64. The Commission sought to have the City held in contempt, but the trial court

---

**14.** A fisc is the public treasury. Black's Law Dictionary 668 (8th Ed.1999).

found the settlement agreement to be void and unenforceable because mandatory processes under the City's charter had not been followed in reaching the agreement. *Id.* at 38, 887 A.2d 64. In affirming the trial court's decision we explained that: "It is well settled that a county or municipality can make a contract **only** in the manner prescribed by the legislature. . . . This rule is strict; if the municipality's charter provisions are not precisely followed during the contracting process, the contract is *ultra vires,* or outside the power of the municipal corporation to make, and void *ab initio." Id.* at 41–42, 887 A.2d 64 (emphasis in original) (internal quotations and citations omitted). We rejected the Commission's argument that the settlement agreement is valid despite the failures to abide by the Charter. In doing so, we noted:

 Maryland appellate courts have repeatedly stated:
No principle of the law relating to municipal corporations is more firmly established than that those who deal with their agents or officers must, at their peril, take notice of the limits of the powers of both the municipality and of those who assume to act as its agents and officers; and *in no State has this principle been more frequently applied or more rigidly enforced than in Maryland.*

*Id.* at 42, 887 A.2d 64 (quoting *Alternatives Unlimited, Inc.,* 155 Md.App. at 427, 843 A.2d 252) (citations omitted) (emphasis in original). Under the analysis required by the precedents discussed above, it is clear that the absence of a written contract amendment approved by the County Council is dispositive of DMJM's claim for payment of additional services— the County cannot be obligated under a contract unless the contract is executed in the formal manner prescribed by law.

DMJM bases its argument that counties are bound by their contracts to the same extent as private entities on *Montgomery County v. Revere Nat'l Corp.,* 341 Md. 366, 671 A.2d 1 (1996). In *Revere,* 341 Md. at 383, 671 A.2d 1, the Court of Appeals held that a settlement agreement incorporated into a court order between a county and a private company was a final judgment that was valid and enforceable. The County

sought to void the agreement alleging fraud, contending that the agreement exceeded the County's authority. *Id.* at 376, 671 A.2d 1. The Court reasoned that "cases have recognized certain unusual and narrowly limited situations when final judgments based on consent of the parties, although not subject to revision under rules like Maryland Rule 2–535, have been deemed non-preclusive or subject to collateral attack." *Id.* at 380, 671 A.2d 1. In this vein, the Court discussed *Kelley v. Town of Milan,* 127 U.S. 139, 8 S.Ct. 1101, 32 L.Ed. 77 (1888), stating that "under the *Kelley* principle the act of placing a settlement agreement made by a local government in the form of a court judgment, . . . will not cure the lack of fundamental power in the governmental entity to make the agreement." *Id.* at 381, 671 A.2d 1. In *Revere,* the Court found that the substance of the agreement was not clearly *ultra vires,*[15] and as such the Court concluded that the scope of *Kelley* need not be addressed. 341 Md. at 382–83, 671 A.2d 1. The Court noted that it would "assume *arguendo,* that it would have been proper to vacate the settlement agreement and judgment . . . if the agreement were clearly *ultra vires." Id.* at 383, 671 A.2d 1.

---

**15.** In *Revere,* the Court held that the agreement was not clearly *ultra vires* for the following reasons: (1) Montgomery County attempted to vacate the consent agreement arguing that it was prohibited from contracting away the exercise of the zoning power. 341 Md. at 375, 671 A.2d 1. The Court held that the settlement agreement did not provide for any type of decision by the zoning authority as the settlement agreement did not obligate the district council to rezone or amend the zoning regulations. *Id.* at 387, 671 A.2d 1. (2) Montgomery County argued that the agreement limited executive authority and discretion in the enforcement of the County's laws. *Id.* at 387–88, 671 A.2d 1. The Court concluded that "as a general matter, the executive discretion in the enforcement and execution of the laws can be limited by contract." *Id.* at 388, 671 A.2d 1. (3) Montgomery County argued that implementation of the agreement would violate the law because the local zoning regulations prohibited all billboards. *Id.* at 390, 671 A.2d 1. The Court reasoned that a zoning violation does not, of itself, equal a violation of the law. *Id.* at 390–91, 671 A.2d 1. The Court held that county zoning regulations flatly prohibiting all billboards did not preclude enforcement of the settlement agreement, absent compliance with the state statute requiring compensation for any sign required to be removed by Montgomery County. *Id.* at 390–92, 671 A.2d 1.

DMJM ignores crucial differences between the facts of *Revere* and the present situation. In *Revere*, there was an executed contract, in the form of the settlement agreement, granting Revere the use of billboards, contrary to Montgomery County's zoning regulation, which was incorporated into a court order. In *Revere*, the Court engaged in an analysis of whether the settlement agreement entered into and incorporated in a court order was made in the method prescribed by law, and determined that the agreement was not *ultra vires.* As such, the Court of Appeals found the agreement valid. In *Revere*, the Court stated, " 'as long as the execution of the contract [is] within the power of the governmental unit,' the local government is answerable in damages for breaching that contract." 341 Md. at 385, 671 A.2d 1 (citation omitted). In *Revere*, to be sure, the Court also stated: "[U]nder Maryland law counties and municipalities are normally bound by their contracts to the same extent as private entities." *Id.* at 384, 671 A.2d 1. This statement, however, was made in the context of counties being bound by contracts properly made in the method prescribed by law and not *ultra vires.* The Court's holding in *Revere* does not conflict with the precedent set forth by the Court of Appeals in *Gontrum* in 1943, and reiterated by Judge Moylan in *Alternatives Unlimited, Inc.,* in 2004, and, as such, does not change our analysis in this case— the County cannot be bound by a contract unless the contract is executed in the formal manner prescribed by law.

### (4) Estoppel

DMJM contends that "counties asserting that a contract is void are subject to estoppel." DMJM argues that "Maryland law has allowed equitable estoppel to be asserted against governmental entities when 'both parties to the transaction have acted and proceeded as if all preliminary formalities and regulations [have] been complied with, and rights have attached.' " DMJM argues that compliance with Articles 4.1 and 4.2 of the contract is subject to the principles of waiver, estoppel, or modification.

The County responds that DMJM's counterclaim alleged only a breach of contract. The County contends that DMJM failed to raise the doctrine of estoppel at trial. As such, the County argues that it is too late for DMJM to raise the issue of estoppel as this issue was not raised in the circuit court. As to the merits in this case, the County contends that "there is no ambiguity with respect to Baltimore County Charter § 715." Charter § 715 requires County Council approval for amendments to a professional services contract for amounts above $25,000 and, as such, the doctrine of estoppel is inapplicable. We agree with the County on all of the above.

Preliminarily, we conclude that DMJM has failed to preserve the issue of estoppel for appellate review. Maryland Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."). DMJM failed to raise the issue of estoppel when the County filed its Motion for Partial Summary Judgment. In DMJM's Opposition to the County's motion, DMJM argued that the additional services were within the ambit of the contract and payment for the additional services did not require formal modification of the contract.[16] At trial, the County made a motion for judgment at the end of its case-in-chief, and renewed this motion at the conclusion of DMJM's case and at the end of all the evidence. The County stated that its request for judgment

---

**16.** To the extent that DMJM argues that the additional services were within the ambit of the approved contract, we conclude that this contention is unfounded. By DMJM's own admission—based on the captions used in the spreadsheets it produced, attached pretrial to its first and second supplemental answers to interrogatories, and entered as trial exhibits—DMJM has acknowledged that the additional services were not part of the original contract. In light of these spreadsheets, DMJM has admitted that the additional services were not covered by the original contract.

Assuming *arguendo,* that the additional services were covered by the base contract, on appeal, the parties have agreed to not "challenge or otherwise question the portion of the judgment for base contract services in the amount of $687,579.00[.]" As such, if the additional services were part of the original contract, the County's agreement to pay DMJM the unpaid balance of the contract price would sufficiently address DMJM's claim for the additional services.

was based on the same arguments set forth in its Motion for Partial Summary Judgment. DMJM responded to the County's motion, made at the conclusion of DMJM's case, as follows:

[DMJM COUNSEL]: Your Honor, I believe that in our Opposition to the Motion For Summary Judgment, we laid out the reasons why. This contract has [a] changes clause. There is no debate [that] the contract was validly entered [ ] into by the County and by DMJM. The County's motion is not well founded and in fact it's an issue of fact for the Jury to determine what if any additional moneys DMJM is due for services provided under this contract. It's a straight issue of fact, Your Honor.

DMJM failed to argue estoppel in its Opposition to the County's Motion for Partial Summary Judgment and, at trial, when opposing the County's motion for judgment. "A contention not raised below either in the pleadings or in the evidence and not directly passed upon by the trial court is not preserved for appellate review." *Zellinger v. CRC Dev. Corp.*, 281 Md. 614, 620, 380 A.2d 1064 (1977) (citation omitted). We conclude, DMJM has not preserved the issue of estoppel for consideration.

Alternatively, as to the merits, we conclude that the doctrine of estoppel is inapplicable in this case. Equitable estoppel is an "equitable remedy." *Alternatives Unlimited Inc.*, 155 Md.App. at 463, 843 A.2d 252. Municipal corporations are not exempt from application of equitable estoppel principles; however, "in practice we have applied the doctrine more narrowly." *Id.* at 428, n. 1, 843 A.2d 252. Although we acknowledged in *Alternatives Unlimited Inc.* that equitable estoppel may apply against municipalities, we qualified this statement, explaining: "[E]quitable estoppel is not applicable when the limited authority of a public officer has been exceeded, or was unauthorized or wrongful." *Id.* (quoting *Gregg Neck Yacht Club v. County Comm'rs of Kent County*, 137 Md.App. 732, 775, 769 A.2d 982 (2001)). The Court of Appeals explained in *Inlet Associates v. Assateague House Condominium Assoc.*, 313 Md. 413, 437, 545 A.2d 1296 (1988), that:

Of course, no principle is better settled than that persons dealing with a municipality are bound to take notice of limitations upon its charter powers. Consequently, "[e]veryone dealing with officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority." Therefore, the doctrine of equitable estoppel "cannot be ... invoked to defeat the municipality in the enforcement of its ordinances, because of an error ‘or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment." In the same vein, McQuillin, *supra*, § 29–104c states that estoppel cannot make lawful a municipal action which is beyond the scope of its power to act or is not executed in compliance with mandatory conditions prescribed in the charter. **In other words, the doctrine of equitable estoppel cannot be invoked to defeat a municipality's required adherence to the provisions of its charter simply because of reliance upon erroneous advice given by an official in excess of his authority.**

(Internal citations omitted) (emphasis added).

## II.

 DMJM contends that in contract cases where damages are sought, prejudgment interest is discretionary with the trier of fact and the trial court erred in failing to give the requested instruction on prejudgment interest.[17] DMJM ar-

---

17. Although we have found error in the trial court's denial of the County's Motion for Judgment regarding DMJM's claim for additional services, the issue of prejudgment interest must be addressed. In the Settlement Agreement and Partial Release of August 12, 2010, the parties agreed:

3. *No Appellate issues on base verdict amount:* In addition to making the aforesaid payment to [DMJM], Baltimore County agrees that in connection with the appeal pending in the Maryland Court of Special Appeals, it will not raise any issues that challenge or otherwise question the portion of the judgment for base contract services in the amount of $687,579.00 or the court's entry of summary judgment in

gues that it was entitled to have the issue of prejudgment interest submitted to the jury as the amounts sought were specific and liquidated. DMJM contends that the refusal to submit the issue of prejudgment interest to the jury was an abuse of discretion.

The County contends the trial court properly denied DMJM's request for prejudgment interest after it erroneously admitted, over objection, DMJM's Exhibit 532, a summary of proposed prejudgment interest. The County argues "that the principal amount upon which the claim for prejudgment interest was calculated was not a liquidated sum." The County maintains that the trial court properly determined as a matter of law that DMJM was not entitled to prejudgment interest and that the issue of prejudgment interest should not have been submitted to the jury.

In this case, DMJM asked the trial court to instruct the jury on the issue of prejudgment interest. "We apply the abuse of discretion standard of review when considering a trial judge's denial of a proposed jury instruction." *Collins v. Nat'l R.R. Passenger Corp.*, 417 Md. 217, 228 (2010), *cert. dismissed*, —— U.S. ——, 131 S.Ct. 1811, 179 L.Ed.2d 673 (2011). DMJM requested that the trial court instruct the jury on prejudgment interest, in part, as follows, "you may, but are not required to, award prejudgment interest from the date upon which you determine the County's obligation to pay, and the amount, were certain." In order to address DMJM's contention—that the trial court abused its discretion in failing to instruct the jury on prejudgment interest—we must first

---

favor of DMJM on certain counts or the jury verdict in favor of DMJM on Baltimore County's affirmative claims. Baltimore County does reserve the right to challenge the remainder of the judgment for additional services in the amount of $966,022.00 **and to oppose DMJM's claims for prejudgment interest on the entire amount of the Counterclaim judgment, which will remain pending before the Maryland County of Special Appeals pursuant to DMJM's cross appeal after this settlement is executed.**
(Emphasis added).

analyze the circumstances under which a trial court is required to submit the issue of prejudgment interest to the jury.

"[P]rejudgment interest as a matter of right is the exception rather than the rule." *Ver Brycke v. Ver Brycke,* 379 Md. 669, 702, 843 A.2d 758 (2004). There are three rules regarding prejudgment interest: (1) as a matter of right—prejudgment interest is allowed as a matter of right when "the obligation to pay and the amount due [have] become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date"; (2) absolute non-allowance—"where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed"; and (3) if the case falls in between the as of right and absolute non-allowance, "prejudgment interest is within the discretion of the trier of fact." *Buxton v. Buxton,* 363 Md. 634, 656–57, 770 A.2d 152 (2001) (internal quotations and citations omitted).

Maryland appellate courts have not considered whether a trial judge erred in failing to submit to the jury, as the trier of fact, the issue of prejudgment interest in a breach of contract case where the award falls between the circumstances of prejudgment interest as a matter of right or clear disallowance. In this case, it is undisputed that DMJM was not entitled to prejudgment interest as a matter of right. Prejudgment interest, however, would not have been absolutely disallowed on DMJM's breach of contract claim, assuming the jury entered a verdict in its favor. The question is whether the trial judge erred in not submitting the issue of prejudgment interest to the jury prior to the verdict. Specifically, we must address whether the trial court was required to submit the issue of prejudgment interest to the jury, prior to the verdict, in a breach of contract action, where there was a dispute as to: (1) whom damages would be awarded—whether damages would be awarded in favor of the County's claim for

negligence or breach of contract or in favor of DMJM's claim for breach of contract; (2) the amount of damages, if any owed; and (3) when the damages occurred. After reviewing relevant case law, we answer the question in the negative.

In tort cases, prejudgment interest has been disallowed on the theory that the amounts sought were not due and owing until judgment, and the prevailing party was not deprived of the use of the interest. *Id.* at 656–57, 770 A.2d 152. The Court of Appeals has previously held—in a case in which the plaintiff sought recovery for real estate commissions sales and damages for tortious interference and for conspiracy to interfere with his alleged real estate listing contract—that where there is a dispute as to the amount of damages, the damages do not become liquidated until the verdict, fixing the amount. *Taylor v. Wahby,* 271 Md. 101, 113, 314 A.2d 100 (1974). In *Taylor,* 271 Md. at 103, 314 A.2d 100, the appellee, a real estate broker, sued several parties for real estate commissions of a property sale for which he was responsible. The trial court determined that "inasmuch as both the interference with the contracts and the conspiracy to interfere with them were effective and complete when the [property was deeded to the buyer], interest should be allowed on the real estate commissions due [appellee] . . . and should be calculated from the dates of the respective deeds." *Id.* at 112, 314 A.2d 100. The Court of Appeals disagreed with the trial court, indicating that the case upon which the trial judge relied "involved a chattel having a readily ascertainable market value and in regard to which the plaintiffs were required to pay out substantial sums over a period of years." *Id.* at 113, 314 A.2d 100. The Court explained:

In the instant case, however, there was a dispute in regard to the amount of damages so far as the commissions were concerned. In addition, various other factors might well have been considered by the lower court in determining the amount of compensable damages. **The amount of damages thus did not become liquidated until the verdict of the court, sitting as a jury, fixed the amount. In short, the claim was unliquidated and not reasonably ascer-**

tainable until the verdict, so that the usual tort rule in regard to unliquidated claims for damages applies, *i.e.*, that interest runs from the time of the verdict.

*Id.* (footnote omitted) (emphasis added). Accordingly, the Court remanded the case to the trial court to adjust the interest to run from the time the judgment was rendered. *Id.* at 117, 314 A.2d 100.

In *Wartzman v. Hightower Prods., Ltd.,* 53 Md.App. 656, 668, 456 A.2d 82 (1983), after a jury trial, the appellee filed a cross-appeal alleging that the trial court abused its discretion in failing to permit the jury to consider prejudgment interest on the jury's award of reliance damages. In that case, "Hightower filed suit alleging breach of contract and negligence for [Wartzman's] failure to have created a corporation authorized to raise the capital necessary to fund [a] venture. At the trial, Hightower introduced into evidence its obligations and expenditures incurred in reliance on the defendant law firm's creation of a corporation." *Id.* at 660, 456 A.2d 82. The trial court instructed the jury that in order to find liability, the plaintiff must prove three things:

First, the employment of the defendants in behalf of the Plaintiff and the extent of the duties for which the Defendants were employed; secondly, that the Defendants neglected the duties undertaken in the employment and, thirdly, that such negligence resulted in and was the proximate cause of loss by the Plaintiff, that is that the Plaintiff was deprived of any right or parted with anything of value in reliance upon the negligence of the Defendants.

*Id.* at 666, 456 A.2d 82. The jury returned a verdict in favor of Hightower in the amount of $170,508.43, and on appeal, Hightower argued that the trial court erred in failing to present the issue of prejudgment interest to the jury. *Id.* at 661, 668, 456 A.2d 82. Finding no error, we stated:

Applicable Maryland law provides that where a claim is for unliquidated damages, interest may run from the date of the judgment, but not before. *Affiliated Distillers* [v. *R.W.L.*

*Wine & Liquor Co.*], 213 Md. 509, 132 A.2d 582, (1957), *Taylor v. Wahby*, 271 Md. 101, 314 A.2d 100, (1974).

The reliance damages sought in this case are not subject to pre-judgment valuation. "Reasonable and justified" damages incurred by reason of Mr. Wartzman's representation of Hightower were not reasonably ascertainable until the jury rendered its verdict. Refusal to permit the jury to consider prejudgment interest, therefore, was not an abuse of discretion.

*Id.* at 668–69, 456 A.2d 82.

In *Republic Ins. Co. v. Prince George's County*, 92 Md.App. 528, 530–31, 608 A.2d 1301 (1992), the plaintiff sought to recover under a performance bond issued by Republic. After a jury trial, Prince George's County appealed the trial court's denial to award prejudgment interest. *Id.* at 539, 608 A.2d 1301. We found no error in the trial court's refusal to award prejudgment interest, stating:

Ordinarily, prejudgment interest is a matter that rests in the discretion of the trier of fact. *First Virginia Bank v. Settles,* 322 Md. 555, 562–565, 588 A.2d 803 (1991). **While interest is recoverable as of right in actions on bonds for a liquidated sum of money,** *Atlantic States Construction Co. v. Drummond & Co. Inc.,* **251 Md. 77, 85, 246 A.2d 251 (1968), Republic's obligation under the performance bond was not liquidated until the time judgment was entered against it. Accordingly, it was within the circuit court's discretion to deny interest to the County.**

*Id.* (emphasis added).

In *Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 772, 923 A.2d 971 (2007), *aff'd,* 403 Md. 367, 942 A.2d 722 (2008), although the issue of prejudgment interest was submitted to the jury, this Court reversed the jury's award of prejudgment interest, concluding that Pulte failed to present evidence at trial warranting an award of prejudgment interest. Pulte, a builder, sued several defendants, including Parex, on various

claims.[18] *Id.* at 697, 700–01, 923 A.2d 971. Before trial, Pulte reached a settlement agreement with all defendants, except Parex. *Id.* at 704–05, 923 A.2d 971. At trial, the jury was given a special interrogatory, providing: "In the event you have found that any damages are due Pulte Home Corporation, do you find that Pulte homes has proven by a preponderance of the evidence that it should be awarded further damages for pre-trial interest?" *Id.* at 708, 923 A.2d 971. The jury answered "yes" to this question, and the trial judge calculated prejudgment interest against Parex. *Id.* at 709–10, 923 A.2d 971.

Parex appealed and argued that the trial court erred by accepting the jury's finding that Pulte was entitled to prejudgment interest, and by awarding pre-judgment interest based on the jury's finding that Parex was liable for $50,000 in damages as to each of twenty-three homes. *Id.* at 770, 923 A.2d 971. Speaking through Judge Arrie W. Davis, we reversed the award of prejudgment interest, explaining:

> In this case, Pulte's entitlement to pre-judgment interest was not a matter of right but rather was within the discretion of the jury as fact finder. Because the only claims that went to the jury were the assigned breach of implied warranty claims of Coronado and CSS, it was essential that, in exercising its discretion to award pre-judgment interest, the jury determine whether Parex's "obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment," and if so when that payment should have been made. *Buxton,* 363 Md. at 656 [770 A.2d 152]. Pulte[ ] posits that Parex became obligated to pay Coronado and CSS on the date the consent judgments against them were entered, and that the trial court correctly calculated the pre-judgment interest from "Pulte's

---

18. Pulte alleged counts of Negligence; Breach of contract; Breach of express warranties; Breach of implied warranty of merchantability and implied warranty of fitness for a particular purpose; Negligence and/or strict liability; Actual fraud; Negligent misrepresentation; Constructive fraud; Negligent misrepresentation; False advertising; Contractual indemnification; and Subrogation. *Id.* at 700–01, 671 A.2d 1.

date of payment." Even assuming that there was one single date of payment for repairs to all twenty-three homes for which the jury determined damages, Pulte's position is untenable.

Clearly, Parex has consistently denied liability for any portion of the damages. The fact that Coronado and CSS settled with Pulte and permitted the entries of consent judgments against them could not render Parex's obligation to pay the applicators "certain, definite, and liquidated" by any "specific date." *Id.* The dispute as to liability was legitimate, and it denied Coronado and CSS—and therefore Pulte—an absolute right to interest and left the matter to the discretion of the fact-finder. *See Gordon [v. Posner ]*, 142 Md.App. [399,] 438 [790 A.2d 675, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002) ].

The jury determined that Pulte, as assignee of Coronado and CSS, was entitled to pre-judgment interest. As we explained in Part IV of our discussion of Parex's cross-appeal, however, Pulte presented no evidence to the jury regarding the settlement. Although ample evidence was presented from which the jury could determine that Coronado and CSS were liable to Pulte for the damages to the relevant homes, the jury was never told when, if ever, Coronado and CSS paid Pulte for repairs, or how much, if anything, they paid. There was simply no basis for the jury's decision that Coronado and CSS—and thus Pulte— were entitled to interest for the loss of income from funds paid out.

*Id.* at 771–72, 923 A.2d 971 (footnote omitted). This Court reasoned that although evidence of the settlement agreements reached prior to trial could form the basis for a jury to find that the sum due to Pulte was certain by a specific date, no such evidence was before the jury. *Id.* at 772, 923 A.2d 971. The lack of evidence of the settlement agreements left Parex's obligation to pay Pulte unliquidated and uncertain. *Id.*

In a case such as this, following the principles drawn from the authorities discussed above, we hold that where

breach of contract damages are unliquidated or not reasonably ascertainable until the verdict, a party is not entitled to a discretionary determination on the issue of prejudgment interest by the jury, prior to the verdict in the case. Prior to the verdict in this case, the amount of damages, if any, due DMJM was not liquidated or reasonably ascertainable.[19] The counts submitted to the jury included the County's breach of contract and negligence claims against DMJM, and DMJM's Counterclaim for breach of contract against the County. DMJM's Exhibit 532, in support of prejudgment interest, consisted of fifty-six (56) invoices spanning from January 8, 2001, to November 1, 2005. The Exhibit specified that the County sent checks in response to forty-one (41) of these invoices spanning from March 1, 2001 to February 23, 2004. The spreadsheet indicated that the County had not paid for the remaining fifteen (15) invoices listed. Based on this information, DMJM calculated fifty-six (56) different amounts owed as prejudgment interest, ranging from $0 to $57,125.49. The County contended, in part, that some amounts were not paid at certain times due to offsets claimed by the County.[20] Any amount due and owing DMJM was not reasonably ascertainable or liquidated until the verdict. As a result, we conclude that the trial court did not abuse its discretion in declining to submit the issue of prejudgment interest to the jury prior to the verdict.

After reviewing the jury instruction and the evidence, namely DMJM's Exhibit 532, we do not believe the trial court's refusal to give the requested instruction was an abuse of

19. Liquidated is defined as "(of an amount or debt) settled or determined, esp. by agreement." Black's Law Dictionary 949 (8th Ed.1999).

20. In the Third Amended Complaint, the County alleged that DMJM breached the contract by failing to comply with the project schedule causing a delay in the project and that DMJM was negligent in its design and oversight of the Project. As such, the County sought $3,500,000 in damages. The County, during the entire course of litigation, argued that the damages sought by the County offset any amount it may have owed to DMJM.

discretion.[21] The instruction above advised the jury it could award prejudgment interest from "the date upon which you determine the County's obligation to pay and the amount were certain." The instruction implied there was a single date upon which the County became obligated to pay a single specific amount. DMJM provided as a basis of its prejudgment interest claim a spreadsheet listing various amounts and dates on which these amounts were due, rather than one amount due at one specific time. Although DMJM wrote in its reply brief to this Court, "[its] claim, which consisted of various separate additional service items along with the undisputed base contract balance, was indeed capable of ascertainment at all relevant times," the requested instruction did not convey this concept to the jury. The requested jury instruction inadequately explained that DMJM sought prejudgment interest for different amounts due at different times. The requested jury instruction did not address how the jury was to

---

**21.** After the close of all the evidence in the case, during the initial discussion regarding jury instructions, as to the "case specific instructions" requested by DMJM, the Court stated: "I'll let you know what my inclinations are. I can tell you what my inclinations are. I can tell you preliminarily, I am disinclined to give an instruction on prejudgment interest." Following this exchange the court recessed to reconvene the next day.

The following day, the trial judge asked if either party wished to be heard on their proposed jury instructions. In response, DMJM stated: Prejudgment interest, number six, Your Honor, in reading the case, *Principal Buckston v. Buckston,* [sic] the issue of prejudgment interest as to whether a date is fixed and certain is actually for the fact finder. I believe Your Honor indicated you were doing to deal with prejudgment interest. I think the case law says it's within the discretion of the fact finder, the calculation, of course, is certainly appropriate for the Court to do once the Jury fixes the date certain. But I believe that's up to the fact finder and I believe the Jury instruction we propose accomplishes that.

The Court responded: "Okay." Following a discussion on other jury instructions, the jury returned and the trial judge instructed the jury. The trial judge did not instruct the jury on the issue of prejudgment interest. After the jury instructions were given, the trial judge called counsel to the bench, and asked: "Each party wish to adopt and incorporate by reference all argument advanced before I gave the instructions, is that correct?" DMJM's counsel responded: "Nothing additional."

determine prejudgment interest in the face of the County's contention that certain amounts were not paid at certain times due to offsets claimed by the County. We conclude that the decision not to instruct on prejudgment interest prior to the verdict was proper as the damages amount was not liquidated or reasonably ascertainable until the verdict, and the requested instruction was not consistent with the evidence generated at trial.

Having addressed the trial court's refusal to submit the issue of prejudgment interest to the jury, prior to verdict, the question becomes whether the trial court erred in not submitting the issue to the jury, after the jury returned the verdict awarding DMJM $1,653,600.88. On return of the verdict, the following occurred:

> THE COURT: Ladies and Gentlemen of the Jury, that concludes the process of the taking of the verdict. If you will step back into the Jury room, I'll be back in just a minute to have a chat with you and then release you. Thank you for your service.

* * *

> [DMJM'S COUNSEL]: Your Honor, before we leave, in light of the Jury's decision on the breach of contract claim by DMJM against the County, Your Honor had reserved the prejudgment interest issue. In the intervening time period between now and whenever, is there anything we need to do or is that simply going to be something you are going to do as part of entering the verdict in this case?
> THE COURT: I would ask for a memo on that from you and if [the County's counsel] chooses to respond, he may, with updated calculation.

Once the jury returned the verdict, DMJM did not renew the request that the issue of prejudgment interest be submitted to the jury, but rather, asked if this was something the court would do as part of entering the verdict in the case. In response, the trial judge asked for a memorandum from DMJM. At no point after the verdict did DMJM ask the trial court to submit the issue of prejudgment interest to the jury.

As such, we find that DMJM has not preserved for our review the question of whether the trial court was required to submit the issue of prejudgment interest to the jury after return of the verdict.[22]

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY DENYING THE COUNTY'S MOTION FOR JUDGMENT IS REVERSED, AND REMANDED WITH INSTRUCTIONS FOR THE CIRCUIT COURT TO VACATE THE JUDGMENT IN FAVOR OF DMJM IN THE AMOUNT OF $966,022.00 FOR ADDITIONAL SERVICES; JUDGMENT AFFIRMED AS TO THE DENIAL OF PREJUDGMENT INTEREST; COSTS TO BE PAID BY APPELLEE/CROSS–APPELLANT.

---

22. Judge Alexander Wright, Jr. did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8–605.1.